**NATURAL RESOURCES DEFENSE COUNCIL, et al., Appellees,**

v.

**Federico F. PENA, Secretary, The Department of Energy, and National Academy of Sciences, Appellants.**

**Nos. 97–5253, 97–5254.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 13, 1998.

Decided July 17, 1998.

Alisa B. Klein, Attorney, United States Department of Justice, argued the cause for the federal appellant. Frank W. Hunger, Assistant Attorney General, Mary Lou Leary, United States Attorney at the time the brief was filed, and Mark B. Stern, Attorney, United States Department of Justice, were on brief.

Nathan C. Sheers argued the cause for appellant National Academy of Sciences. Carter G. Phillips, James R. Wright and Audrey Byrd Mosley were on brief.

Howard Crystal argued the cause for the appellees. Eric R. Glitzenstein was on brief.

Before: HENDERSON, ROGERS and GARLAND, Circuit Judges.

KAREN LeCRAFT HENDERSON, Circuit Judge:

This appeal poses the recurring question of what remedy is appropriate for a federal agency's violation of the Federal Advisory Committee Act, 5 U.S.C.App. 2, §§ 1 *et seq.*, (FACA). The appellants, the United States Department of Energy (Department or DOE) and the National Academy of Sciences (Academy or NAS), appeal the district court's grant of a permanent injunction against the Department's use of or reliance on a report prepared by an Academy committee, which committee both the Department and the Academy concede was organized and operated in violation of FACA. Because we have serious doubts whether the "use injunction" redresses any of the appellees' claimed injuries and because we believe the district court erred in failing to afford the appellees an opportunity to take discovery and refine their request for equitable relief, we reverse and remand.

## I. BACKGROUND

In December 1995 a DOE official contacted the then-president of the Academy, proposing a contract between the Department and the Academy pursuant to which the Academy would select and convene a commit-tee of experts to study and review certain technical and scientific issues associated with the Department's Inertial Confinement Fusion (ICF) Program. "ICF is a conceptual method for achieving a fusion reaction by compressing and confining a small pellet containing fuel such as a deuterium and tritium mixture through the inward forces of inertia generated on the fuel by the ablation ... of the outer surface of the pellet." Zolandz Decl. ¶ 7. The scientific objective of ICF is to achieve "ignition"—i.e., a self-sustaining fusion reaction that produces more energy than is required to initiate the reaction. *Id.* ¶ 6. The Department sponsors and performs research into and development of ICF processes to provide "valuable information for national defense, energy, and other industrial and scientific applications." First Crandall Decl. ¶ 4.

The Academy and the Department formalized their agreement in a letter contract in May 1996. Under the contract, the ICF committee (Committee) was given three missions: "(1) determine the scientific and technological readiness of the NIF [National Ignition Facility] project, (2) assess the entire ICF program (including program scope, balance, and priorities; facility operation; experimentation; theory; etc.) and make recommendations to facilitate the achievement of the scientific goal, which is ignition, and (3) evaluate the capabilities of the ICF program (in conjunction with NIF) to support [Science–Based Stockpile Stewardship program to maintain national nuclear arsenal]." Taylor Decl. ¶ 11. NIF is a principal component of the Department's ICF program and is "a national center to study inertial fusion and high-energy-density science." First Crandall Decl. ¶ 5. It is being built, at a projected cost in excess of $1 billion, at the Lawrence Livermore National Laboratory (LLNL) in Livermore, California. *Id.* When complete, the "NIF will house a powerful laser, consisting of 192 beams, which will be used to simulate processes that occur in nuclear weapons and to 'ignite' small fusion targets in the laboratory for the first time." *Id.* As of the date the Department contracted with the Academy to form the Committee, NIF had entered the preliminary

design and planning stage but the Department had not yet decided whether to proceed with construction. *Id.* ¶ 12.

Pursuant to the letter contract, the Department agreed to pay the Academy $335,-700 to defray the Committee's costs during the first (and, as it now turns out, only) year of its existence. The Academy, in accordance with its own procedures but without reference to FACA, named fifteen scientists to the Committee in May 1996. Zolandz Decl. ¶¶ 11, 13. The Department had no input into or control over the appointments. *Id.* ¶¶ 13–14. While some Committee members, it appears, had consulting contracts with, or other professional ties to, LLNL (*see* First Cochran Decl. ¶ 8), "[n]o one receiving any funding from a DOE ICF program ... was permitted to serve as a member of the ICF committee." Zolandz Decl. ¶ 19. Moreover, no DOE personnel participated in the Committee's deliberations. *Id.* ¶ 16.

The Committee met six times during the fall of 1996. At the Committee's request, DOE personnel attended most of the meetings and briefed the Committee on various aspects of the ICF program and NIF. The majority of the briefings were closed to the public because of their classified nature. Upon request, the Academy apprised the public of the Committee's membership, agendas, open meetings and mission statement. When appropriate, the Committee also allotted meeting time to members of the public to present their views. Indeed, three of the four appellees—the Natural Resources Defense Council (NRDC), Dr. Thomas B. Cochran and Tri–Valley CAREs (Citizens Against a Radioactive Environment)—made known to the Committee their views on the ICF program and NIF. The fourth appellee, the Western States Legal Foundation, was invited to a Committee meeting but declined to attend. *See* Zolandz Decl. ¶ 24; Velluvia Decl. ¶ 4.

The Committee concluded its meetings in December 1996 and began drafting a report of its findings. The same month the Department approved the Programmatic Environmental Impact Statement for NIF, a statement required by the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*,

thus clearing the last major regulatory bar to constructing NIF. On February 14, 1997, however, the appellees filed a complaint for declaratory and injunctive relief, alleging that the Committee was an "advisory committee" and that it had not been established or operated in conformity with FACA. The complaint sought equitable relief and attorneys' fees, specifically requesting that the district court:

(2) preliminarily and permanently enjoin DOE from relying on any deliberations, reports or recommendations from the ICF Committee;

(3) preliminarily and permanently enjoin DOE from providing any funding for activities of the ICF Committee, including the dissemination of any reports or other work product;

(4) preliminarily and permanently enjoin NAS from permitting the ICF Committee to continue to meet, deliberate, or prepare any work product, including the Interim Report; ....

Compl. 9–10.

Each of the four appellees is either a nonprofit organization or an employee of such organization. Since 1982, appellee Western States Legal Foundation "has engaged in administrative proceedings, litigation, public education efforts and grassroots organizing to promote disarmament, ensure the clean-up of federal nuclear weapons research, testing and production facilities, and challenge nuclear weapons programs." Compl. ¶ 6. It includes members who "live and engage in recreational activities in the vicinity of LLNL." *Id.* Appellee Cochran is employed by the NRDC as the director of its nuclear program and has a professional interest in and involvement with nuclear energy and non-proliferation issues. *See id.* ¶ 4. Appellee NRDC has "over 300,000 members, and is interested in the work of the ICF Committee." *Id.* ¶ 3. Appellee Tri–Valley CAREs is based in Livermore, California and "undertakes projects that increase public knowledge of the relationship between peace and environmental issues, including public education regarding potential impacts from the production, treatment, storage and disposal of hazardous and radioactive waste." *Id.* ¶ 7. Tri–

Valley's members "reside, own property, work, recreate and attend ·public meetings near LLNL" and they "have participated in many administrative, legal and grassroots efforts involving the DOE's nuclear weapons complex, including the plans for the NIF at LLNL." *Id.* Of particular concern to Tri-Valley's membership is the potential environmental contamination that may result from NIF's operation, including release into the environment of deuterium and tritium—two elements that are the primary constituents of the fuel pellets NIF intends to ignite. *See* Kelley Decl. ¶¶ 4–9.

The apparent impetus for this lawsuit is a decision of this Court, *Animal Legal Defense Fund v. Shalala,* 104 F.3d 424 (D.C.Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 367, 139 L.Ed.2d 285 (1997), (*ALDF*) which on January 10, 1997 held that a committee created by the Academy for the benefit of the United States Department · of Health and Human Services constituted an "advisory committee" and was therefore subject to FACA requirements. The *ALDF* decision reversed a December 1995 district court order which the Department and the Academy had apparently relied on in determining that the Committee need not comply with FACA. Perhaps operating on the same assumption, the appellees never invoked FACA, although they did complain about the Committee's composition and raised conflict-of-interest questions, until after *ALDF* was decided—at which point the Committee had already concluded its meetings and was drafting its final report.

In the wake of *ALDF,* the Department in effect conceded that the Committee must be deemed an "advisory committee" and that it had not complied with FACA. Both the Department and the Academy argued, however, that the district court could not remedy the violations by means of an injunction proscribing either publication of the Committee's report or the Department's use of the Committee's findings. The district court disagreed with the latter argument and on March 5, 1997 enjoined the Department from (1) expending any additional unobligated money to fund Committee operations or (2) "utilizing, relying on or in any way incorporating into its decisionmaking process the ICF Commit-

tee report or any other work product of the ICF Committee." *Natural Resources Defense Council v. Curtis,* No. 97–0308 (D.D.C. Mar. 5, 1997) (order granting preliminary funding and use injunctions), (*NRDC I*). In so concluding, the district court reasoned:

> In this case, injunctive relief is necessary and appropriate to preserve the purposes of FACA, to avoid making it a "nullity" and to preserve plaintiffs' right to ensure that advisory committees to DOE comply with the statute's dictates. The fact that some funds have already been spent cuts in the opposite direction, while the record is insufficient for the Court to determine whether the few ICF Committee meetings that were open to the public (less than 30 percent) constituted a sufficient attempt to ensure public accountability. On balance, the Court finds that the factors articulated in *California Forestry Ass'n v. United States Forest Service,* 102 F.3d 609 (D.C.Cir.1996) weigh heavily in favor of injunctive relief.

*Id.* Citing the Committee members' First Amendment rights, the district court declined, however, to enjoin the Academy from publishing the Committee's final report. *Id.*

On March 11, 1997, six days after the injunction issued and nine days before the Committee published its final report, the Department announced its decision to construct NIF. Second Crandall Decl. ¶ 2. While the question whether to construct NIF was not part of the Committee's charge, its report assessed "the technical and scientific readiness of the NIF to proceed to the construction phase, identifies specific technical issues needing additional study, i.e., 'remaining hurdles' in parallel with NIF construction, and arrives at certain findings and conclusions related to the NIF." *Id.* ¶ 5. Indeed, on December 6, 1996, before the appellees brought suit, the Committee orally apprised the Department that it saw no "technical reason to delay [construction of] the NIF." First Crandall Decl. ¶ 17.

The Department subsequently moved for reconsideration and clarification of the district court's use injunction but did not contest the funding injunction or declaratory relief, thereby agreeing to the Committee's

abolition notwithstanding it was originally intended to meet for three years. *See* NAS Br. 17–18 ("The current ICF Committee has been disestablished and does not exist anymore."). Thus, "[p]ursuant to FACA, as amended, if the Academy is asked to continue the periodic review of the DOE's ICF Program, the Academy will create a new advisory committee for that purpose." *Id.* at 17 n. 6.

The district court denied the Department's reconsideration request. *See Natural Resources Defense Council v. Curtis,* No. 97–0308 (D.D.C. May 13, 1997) (order denying motion for reconsideration), (*NRDC II*). Further, the district court clarified that its use injunction "encompasses all [departmental] employees and subcontractors, including the ten national laboratories and six primary contractors performing ICF-related work identified by DOE in its papers." *Id.*

Deciding not to proceed with discovery and a trial on the merits in the event the district court had properly awarded injunctive relief pursuant to *California Forestry Association v. United States Forest Service,* 102 F.3d 609 (D.C.Cir.1996), on July 14, 1997 the Department moved for expedited entry of a permanent use injunction. The appellees opposed the motion, contending that bypassing discovery and further factfinding deprived them of the opportunity to compile a factual record that would sustain a permanent use injunction on appeal as well as the chance to request additional equitable relief. Indeed, in contesting the expedited entry of a permanent use injunction, the appellees conceded that a use injunction was the "most Draconian" relief they could be awarded and that it was "not necessarily" the relief they would seek after discovery. Status Conference of 8/6/97 Tr. 10. Instead, they requested the use injunction simply to maintain the status quo, recognizing that the Department "ultimately might be able to use" the technical provisions of the report and they might eventually obtain only "access" to Committee materials. *Id.* at 9; *see also id.* at 4, 7.

The district court, however, sided with the Department, concluding that the "plaintiffs have already obtained all the relief they requested, except for an injunction against the National Academy of Sciences, which the Court expressly denied in its March 5, 1997 decision and order, and an award of attorneys' fees, a matter that obviously remains open." *Natural Resources Defense Council v. Pena,* No. 97–0308(D.D.C. Aug. 6, 1997) (order and judgment entering permanent use injunction), (*NRDC III*). The appellees subsequently moved to supplement the record but the district court denied the motion, concluding that Fed.R.Civ.P. 52(b) does not authorize post-judgment supplementation. *See Natural Resources Defense Council v. Pena,* No. 97–0308 (D.D.C. Oct. 9, 1997) (order denying motion to supplement), (*NRDC IV*). In so ruling, the district court noted that because "the Department of Energy has stated that on appeal it does not intend to challenge the completeness of the record that was before the Court when it entered final judgment[,] ... [p]laintiffs therefore will not be in the position of arguing the sufficiency of the factual record that was before this Court." *Id.* The Department and the Academy timely appealed only the district court's permanent use injunction, declining to contest either the declaratory relief or the funding injunction the district court also awarded.

## II. DISCUSSION

The Department argues that we should reverse and vacate the district court's use injunction because the appellees do not have standing to sue for such relief and, even if they do, the equities do not warrant such a draconian remedy. The Academy adds that the district court misapplied the test set forth in *California Forestry,* the appellees' conflict-of-interest and unbalanced-composition claims are either inapposite or not justiciable and FACA does not extend to a technical committee like the Committee that does not provide advice to a federal agency on a discrete governmental policy.[1] The appellees

---

1. The Academy's last argument is difficult to square with its representation that it does not challenge "those portions of the district court's judgment declaring that the DOE and the Acade-

my violated FACA and prohibiting any further funding or support to the ICF Committee." NAS Br. 18; *but cf. id.* at 35 ("Here, where the ICF has provided purely scientific and technical ad-

respond to these arguments and also contend that the Department's decision to seek expedited entry of a permanent use injunction estops it (and the Academy) from challenging (1) the adequacy of the factual record, (2) the district court's application of the law to the facts and perhaps even (3) the use injunction itself. Alternatively, they argue that if the district court's use injunction cannot be sustained on the current record, we should remand so that they have the opportunity to discover the materials necessary to support the injunction or to request other equitable relief. Because the standing question goes to our jurisdiction, we address it first. *See Steel Co. v. Citizens for a Better Env't,* —— U.S. ——, ——, 118 S.Ct. 1003, 1012, 140 L.Ed.2d 210 (1998) ("We decline to endorse such an approach [reaching merits rather than addressing jurisdictional questions] because it carries the courts beyond the bounds of authorized judicial action and thus offends fundamental principles of separation of powers.").

### A. The Appellants' Standing

■ "The most obvious difference between standing to appeal and standing to bring suit is that the focus shifts to injury caused by the judgment rather than injury caused by the underlying facts." 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3902, at 63 (2d ed.1991). The appellees argue that because the use injunction was entered at the behest of the Department, it is not injured by the district court's final order and "may not appeal from a disposition in its favor." *Showtime Networks, Inc. v. FCC,* 932 F.2d 1, 4 (D.C.Cir.1991). The argument exalts form over substance. While the Department did request expedited entry of the permanent

use injunction, it plainly did not do so to secure a "disposition in its favor." *Cf. Thomsen v. Cayser,* 243 U.S. 66, 83, 37 S.Ct. 353, 61 L.Ed. 597 (1917) (denying motion to dismiss appeal where plaintiffs did not oppose dismissal below because "[t]he plaintiffs did not consent to a judgment against them, but only that, if there was to be such a judgment, it should be in final form instead of interlocutory, so that they might come to this court without further delay"); *Devex Corp. v. Houdaille Indus., Inc.,* 382 F.2d 17, 20–21 (7th Cir.1967) (defendant's role in proposing terms of final injunctive order did not divest court of appellate jurisdiction to review order at defendant's behest).

■ Moreover, we do not believe the Department waived its right to appeal by moving for expedited entry of a permanent use injunction. The consent-to-judgment waiver doctrine provides that a party that consents to entry of final judgment waives its right to appeal the judgment unless it expressly reserves that right. *See Shores v. Sklar,* 885 F.2d 760, 764 n. 7 (11th Cir.1989) ("Shores' argument is intuitively suspect, because it would effectively eliminate the long-established consent-to-judgment waiver doctrine; that doctrine, and each case applying it, rests upon the consent (i.e., waiver) of the party.... This consent-to-judgment doctrine does not implicate the subject matter jurisdiction of the court, although the doctrine is sometimes cast in jurisdictional language, with references to the 'standing' of the party to contest the issue on appeal."), *cert. denied,* 493 U.S. 1045, 110 S.Ct. 843, 107 L.Ed.2d 838 (1990); *Coughlin v. Regan,* 768 F.2d 468, 470 (1st Cir.1985) ("While it is possible for a party to consent to a judgment and still preserve his right to appeal, he must reserve that right unequivocally, as it will not

vice that is not advice on any identified governmental policy, FACA's provisions should not apply....."). As a result, we doubt whether the Academy has preserved for appeal an objection to the district court's declaration of a FACA violation.

Were we to reach the merits of the Academy's argument on FACA's applicability, we doubt we would find the argument persuasive because it focuses on how the Committee was used rather than on the Committee's creation. *See ALDF,* 104 F.3d at 428 ("[T]he definition given by the

Court [in *Public Citizen v. United States Department of Justice,* 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989)] to an advisory committee utilized by the federal government focuses not so much on *how* it is used but whether or not the character of its creating institution can be thought to have a quasi-public status.") (emphasis original). *But cf. Judicial Watch, Inc. v. Clinton,* 76 F.3d 1232, 1233 (D.C.Cir.1996) ("Accordingly, we have recognized that [FACA] is limited to [established] committees that provide advice on an identified governmental policy.").

be presumed."). The Department's motion for expedited entry of a permanent use injunction makes clear its intent to appeal the district court's final judgment. *See DOE's Mot. for Expedited Entry of Permanent Inj., and Supp. Mem.* 2, ¶ 5 ("[T]he Secretary seeks the opportunity to appeal a permanent injunction now, rather than waiting for entry of final judgment after plaintiffs' claims for relief against NAS are resolved, which will not occur for at least several months."). Therefore, while the Department's strategy may have been unnecessary in light of 28 U.S.C. § 1292(a) (allowing appeal from interlocutory injunctive order), it did not thereby waive its right to appeal.

Even if the Department had not expressly reserved its right to appeal, it would not have waived its objection to the appellees' standing—an objection directed to the district court's subject matter jurisdiction. *See White v. Commissioner,* 776 F.2d 976, 977 (11th Cir.1985) (noting two exceptions to consent-to-judgment waiver doctrine: "(1) where the party did not actually consent; (2) where the court lacked subject matter jurisdiction to enter the judgment"); *Coughlin,* 768 F.2d at 470 ("Relief on appeal from a consent judgment is available only on a showing of either lack of actual consent, fraud in obtaining consent, lack of federal jurisdiction, or mistake."). Thus, we would have appellate jurisdiction at least over the Department's challenge to the appellees' standing—which in any event, for the reasons discussed below, is the only claim we reach.

■ The Academy, however, is not so situated. As the district court recited below, "The preliminary injunction runs only against the Department of Energy and not against the NAS in any way." *NRDC II, supra; accord NRDC III, supra* ("[P]laintiffs have already obtained all the relief they requested, except for an injunction against the National Academy of Sciences, which the Court expressly denied."). We therefore fail to see how the Academy is aggrieved. It plainly was not harmed by the district court's decision to *deny* the appellees' prayer for injunctive relief against the Academy. *See Public Serv. Comm'n of Mo. v. Brashear Freight Lines, Inc.,* 306 U.S. 204, 206, 59 S.Ct. 480, 83 L.Ed. 608 (1939) ("[T]he successful party below has no standing to appeal from the decree denying the injunction."); *McLaughlin v. Pernsley,* 876 F.2d 308, 313 (3d Cir.1989) ("Because the preliminary injunction does not affect any legally cognizable interest of CSS, we will dismiss this appeal of CSS for lack of standing."). Moreover, when we pressed the Academy at oral argument to describe how it had been harmed by the district court's use injunction, the only answer the Academy gave was that the injunction infringed its First Amendment right to be heard by the audience of its choosing (i.e., the Department), relying on the holding in *City of Madison, Joint School District No. 8 v. Wisconsin Employment Relations Commission,* 429 U.S. 167, 97 S.Ct. 421, 50 L.Ed.2d 376 (1976). *See* Oral Argument of 5/13/98 Tr. 29–31. Even assuming the Academy had such a right, the district court's use injunction does not infringe it. The injunction does not forbid the Department from listening to the Academy's views; it bars the Department from "utilizing, relying on or in any way incorporating into its decisionmaking process the ICF Committee report or any other work product of the ICF Committee." *NRDC III, supra; cf. Center for Auto Safety v. Cox,* 580 F.2d 689, 694 (D.C.Cir.1978) ("We see no serious constitutional problems inherent in application of FACA to independent organizations acting as spokesmen for their members. AASHTO and its members remain free to communicate their views to the Administrator. They remain free to lobby the FHWA. Congress has determined simply that when a federal executive official utilizes an advisory committee to assist him in discharging his responsibilities, in most instances he must do so openly and publicly. AASHTO has no First Amendment right to have the Administrator keep its communications secret."). Accordingly, we conclude that the Academy is without standing to appeal the district court's use injunction.

### B. The Appellees' Standing

Having determined that only the Department can appeal, we turn now to the question of the appellees' standing to sue for a use injunction. We think it important to note

first that our *California Forestry* decision in no way suggested that the standing inquiry is optional if a FACA use injunction is involved. Indeed, we did not address the question of standing in that case because the district court had not had the opportunity to consider whether injunctive relief was proper, much less to find facts determining the plaintiff's standing to sue for the relief. *See California Forestry,* 102 F.3d at 613 ("We are unable to determine the propriety of injunctive relief at the summary judgment stage because the district court has yet to make factual findings.").[2] Moreover, because Article III standing is always an indispensable element of the plaintiff's case, neither we nor the Congress can dispense with the requirement—even if its application renders a FACA violation irremediable in a particular case. *See Bennett v. Spear,* 520 U.S. 154, 117 S.Ct. 1154, 1161, 137 L.Ed.2d 281 (1997) (comparing "immutable requirements" of Article III standing with prudential standing limitations, which, "unlike their constitutional counterparts, ... can be modified or abrogated by Congress"); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ("Since they are not' mere pleading requirements but rather an indispensable part of the plaintiff's case, each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation."); *Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 665–66 (D.C.Cir.1996) (en banc) ("[A]n inescapable result of any standing doctrine application is that at least some disputes will not receive judicial review. That analysis of a party's standing should sometimes dictate this result is not a reason to reject either the result or the analysis.").

■■■ The Article III standing inquiry includes three elements:

First and foremost, there must be alleged (and ultimately proven) an injury in fact—a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical. · ... Second,

there must be causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. ... And third, there must be redressability—a likelihood that the requested relief will redress the alleged injury. ... This triad of injury-in-fact, causation, and redressability comprises the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence.

*Steel Co.,* —— U.S. at —— – ——, 118 S.Ct. at 1016–17 (internal quotations and citations omitted).

The Supreme Court's decision in *Public Citizen v. United States Department of Justice,* 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989), addresses the standing of a private party to seek redress for a FACA violation. In *Public Citizen* the plaintiffs sued for injunctive and declaratory relief based on the Justice Department's failure to abide by FACA requirements in consulting with the American Bar Association's (ABA's) Standing Committee on the Federal Judiciary about the qualifications of a nominee for appointment to a federal judgeship. The plaintiffs did not seek to enjoin the Justice Department from using the ABA Committee's work product; rather, they sought to enjoin it from "utilizing the ABA Committee as an advisory committee *until it complied* with FACA." *Public Citizen,* 491 U.S. at 447, 109 S.Ct. 2558 (emphasis added). The ABA argued that the plaintiffs did not have standing to sue for injunctive relief because (1) their asserted injury—exclusion from committee meetings and no access to committee documents and records—was "a general grievance shared in substantially equal measure by all or a large class of citizens" and because (2) the plaintiffs "have not demonstrated that a decision in their favor would likely redress the alleged harm, because the meetings they seek to attend and the minutes and records they wish to review would probably be closed to them under FACA." *Id.* at 448–49, 109 S.Ct. 2558 (citation to brief omitted). The Supreme Court rejected both

---

2. Similarly, the authority the appellees use for support, *Alabama–Tombigbee Rivers Coalition v.*

*DOI,* 26 F.3d 1103 (11th Cir.1994), does not directly address standing.

arguments: first, it concluded that "refusal to permit appellants to scrutinize the ABA committee's activities to the extent FACA allows constitutes a sufficiently distinct injury to provide standing to sue," *id.* at 449, 109 S.Ct. 2558; second, it held that the "[a]ppellants' *potential* gains are undoubtedly sufficient to give them standing," *id.* at 451, 109 S.Ct. 2558 (emphasis added). With respect to the latter holding, the Supreme Court observed that a ruling in the appellants' favor would require the ABA Standing Committee "to file a charter and give notice of its meetings" and would allow the appellants to attend at least some meetings and to obtain at least some documents—especially, "discussions and documents regarding the overall functioning of the ABA Committee, including its investigative, evaluative, and voting procedures." *Id.* at 450, 109 S.Ct. 2558.

■ The Department contends that the appellees here lack standing to sue because the use injunction will not redress any of their claimed injuries—namely, exclusion from *past* Committee meetings and denial of access to Committee records and documents. In other words, the Department argues, the appellees have not shown that the Department's use of the Committee's report or other work product will cause them to sustain an Article III injury in fact.

The appellees first counter that, as the district court concluded, *Public Citizen* makes clear their standing to sue for a use injunction. We disagree. Unlike the injunctive relief at issue in *Public Citizen*, the use injunction awarded here will not give the appellees access to Committee documents and future Committee meetings. Indeed, the Committee has been dissolved and will no longer meet, deliberate or generate documents or records. Moreover, the use injunction does not require the disclosure of any Committee documents or records. Accordingly, we agree with the Department that *Public Citizen* does not compel the conclusion that the appellees have standing to seek any and all kinds of equitable relief for the admitted FACA violations. *Cf. City of Los*

*Angeles v. Lyons,* 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (while past exposure to alleged illegal conduct was presumably sufficient to establish plaintiff's standing to sue for damages, it was inadequate standing for injunctive relief).

■ Alternatively, the appellees argue that the use injunction redresses both their past *and* their future injuries:

First, plaintiffs were denied their rights to contemporaneous access to the workings of the ICF Committee. Had DOE and NAS complied with FACA, plaintiffs could have reviewed materials presented to, and prepared by, the ICF Committee, presented comments based on this review, and generally played the public oversight role for which FACA is designed. Instead, they were denied this contemporaneous access. An injunction against the use of the ICF Committee Report redresses this injury by preventing DOE from making use of the product of this illegal process. *See Alabama–Tombigbee Rivers Coalition v. Department of Interior,* 26 F.3d 1103 (11th Cir.1994).

Second, *plaintiffs' injury continues to the present because DOE and NAS are withholding materials which Section 10 of FACA requires be released to the public.* Thus, were the Court to permit DOE to make use of the ICF Committee Report now, plaintiffs' injury would be compounded because they *still* would not have the materials to which they are entitled under FACA, and which they need in order to publicly critique the Report in the manner that FACA allows. Enjoining DOE from using the Report—at least until and unless DOE and NAS make some additional effort to comply with FACA—redresses this injury by preventing DOE from *both* taking advantage of the Report and simultaneously denying plaintiffs access to the materials underlying it.

Appellees Br. 27 (emphasis original; footnote omitted).[3] We are not convinced by either argument.

---

3. The appellees also argue that the Department's request for entry of a permanent use injunction, and the resulting cessation of discovery, estops it

from now challenging their standing. *See* Appellees Br. 28. We cannot agree. Standing is a "threshold jurisdictional question," *Steel Co.,* —

The first erroneously presumes that the punitive consequences of the injunctive order suffice to establish that the order redresses the Department's past FACA transgressions. On the contrary, injunctive relief principally serves a remedial purpose, not a punitive one, and thus the injunction's collateral punitive effects do not by themselves satisfy Article III's redressability requirement. *See Hartford–Empire Co. v. United States*, 323 U.S. 386, 409, 65 S.Ct. 373, 89 L.Ed. 322 (1945) ("[W]e may not impose penalties in the guise of preventing future violations."); *id.* at 435, 65 S.Ct. 373 (Black, J. dissenting) ("[R]elief in equity is remedial, not penal."); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2942, at 53–54 (2d ed.1995) ("[S]ince the purpose of an injunction is remedial, not punitive, if the effect of granting relief is to penalize defendants ... it may be denied.") (footnotes omitted). To the extent the appellees suggest that the use injunction serves the admittedly remedial purpose of deterring the Department from violating FACA *in the future*, in the absence of allegations regarding the likely occurrence of such violations, such a "generalized interest in deterrence ... is insufficient for the purposes of Article III." *Steel Co.*, —— U.S. at ——, 118 S.Ct. at 1019. Moreover, their argument mistakenly assumes that injunctive relief redresses past FACA violations. To the contrary, "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974); *accord Steel Co.*, —— U.S. at ——, 118 S.Ct. at 1020 ("Because respondent alleges only past infractions of [the statute], and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury."); *City of Los Angeles v. Lyons*, 461 U.S. 95, 105, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ("*Lyons'* standing to seek the injunction requested depended on whether he was likely to suffer *future* injury from

the use of the chokeholds by police officers.") (emphasis added); *Juidice v. Vail*, 430 U.S. 327, 331–33, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977) (certain appellees lacked standing to sue for injunctive relief because they had completed prison term or paid applicable fine and were not "threatened with further or repeated proceedings."); *Church v. City of Huntsville*, 30 F.3d 1332, 1337 (11th Cir. 1994) ("Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges, and ultimately proves, a real and immediate—as opposed to merely conjectural or hypothetical—threat of future injury.").

The appellees' second argument—that the use injunction redresses their continuing injury stemming from the Department's ongoing refusal to give them FACA access to Committee documents and records—is equally without merit. That the appellees may have sustained a continuing injury by virtue of the Department's ongoing denial of FACA access to Committee documents and records cannot support their standing to sue for an injunction that does not itself address the access issue. *See Steel Co.*, —— U.S. at ——, 118 S.Ct. at 1019 ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").

Finally, the appellees argue in the alternative that they should have the opportunity to take discovery and/or to streamline their request for equitable relief in order to overcome any standing problem or other shortcoming. The argument is tied to the significant differences between the evidentiary support required for preliminary injunctive relief and that required for permanent injunctive relief:

> The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held. Given this limited purpose, and given the haste that is often necessary if those positions are to be preserved, a pre-

U.S. at ——, 118 S.Ct. at 1016, and "no action of the parties can confer subject-matter jurisdiction." *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). "Thus, the

consent of the parties is irrelevant, ... principles of estoppel do not apply, ... and a party does not waive the requirement by failing to challenge jurisdiction early in the proceedings." *Id.* (internal citations omitted).

liminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits. A party thus is not required to prove his case in full at a preliminary-injunction hearing, ... and the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.... In light of these considerations, it is generally inappropriate for a federal court at the preliminary injunction stage to give a final judgment on the merits.

*University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981) (citations omitted); *accord Communications Maintenance, Inc. v. Motorola, Inc.*, 761 F.2d 1202, 1205 (7th Cir.1985) ("A court must be cautious in adopting findings and conclusions from the preliminary injunction stage in ruling on a motion for summary judgment for two reasons. First, a court's findings of fact and conclusions of law at the preliminary injunction stage are often based on incomplete evidence and a relatively hurried consideration of the issues. ... Second, the questions focused on differ in deciding a motion for preliminary injunction and in deciding a motion for summary judgment. In the former, a court considers whether there is a *reasonable likelihood* that the *moving party* will prevail on the merits; in the latter a court considers whether there is any *issue of material fact* remaining after construing the facts in a *light most favorable* to the *non-moving* party.") (emphases original; citations omitted).

The district court's decision to omit both discovery and a trial on the merits, thus losing the opportunity to consider less severe equitable relief, had the same effect as would have occurred had the appellees been required to fully make their case at the preliminary injunction hearing—a practice at odds with both the Federal Rules of Civil Procedure and the provisional nature of preliminary injunctive relief. *See United States v. Owens*, 54 F.3d 271, 277 (6th Cir.1995) ("[W]e must vacate the permanent injunction and remand this case to the district court to allow [the plaintiff] to conduct additional discovery and present his version of the facts at an evidentiary hearing. Otherwise, we would create a rule that would obligate a party to present his full case at a hearing for a preliminary injunction."), *cert. dismissed sub nom. Spirko v. United States*, 516 U.S. 983, 116 S.Ct. 492, 133 L.Ed.2d 418 (1995).

Moreover, we believe the unusual circumstances here indicate that reversal and remand, rather than vacatur, appropriately dispose of the appeal. In this regard, we rely on our decision in *Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.*, 28 F.3d 1268 (D.C.Cir.1994). In *Fair Employment* the plaintiffs' only viable claim sought injunctive relief. Their complaint, however, did not allege a likely future injury that would be redressed by such relief and thus their claim was fatally defective on standing grounds. *Id.* at 1272–74. Nonetheless, because the district court erroneously believed that the plaintiffs' allegations were sufficient to establish their standing, it did not consider whether the plaintiffs should be permitted to amend their complaint to add allegations of prospective injury. *Id.* at 1275. We then determined that a remand rather than outright dismissal was preferable:

> [W]hile we vacate the district court's denial of [the defendant's] motion to dismiss the individual testers' suit, we do not order it to grant that motion; instead, we remand the case for the district court to exercise its sound discretion over whether to permit amendment. We see no reason why plaintiffs who win in the district court should automatically be in a *worse* position than plaintiffs whose allegations of standing have been rightly found defective by the district court.

*Id.* (emphasis original). Indeed, the case for remand is somewhat stronger here than in *Fair Employment* because here the appellees plainly have standing to request injunctive relief directing the Department to make Committee documents and records available to the full extent permitted by FACA, *see Public Citizen*, 491 U.S. at 450–51, 109 S.Ct. 2558; *see also FEC v. Akins*, —— U.S. ——, ——, 118 S.Ct. 1777, 1784, 141 L.Ed.2d 10, —— (1998), and on appeal they have indicated their desire to specifically request that relief. *See* Oral Argument of 3/13/98 Tr. 36;

*cf. California Forestry,* 102 F.3d at 614 ("We cannot assess these competing claims at this stage and therefore remand to the district court to fashion an appropriate remedy in the first instance.").

Finally, we think a remand here is also consistent with our precedent allowing jurisdictional discovery and factfinding if allegations indicate its likely utility. *See Women's Equity Action League v. Bell,* 743 F.2d 42, 44 (D.C.Cir.1984) ("On the record before this court, we are unable to decide these [standing] issues in the first instance. Issues of unresolved fact may be implicated. Moreover, it is our general practice to allow full development and presentation in the district court of matters that surface initially on appeal. ... We will therefore remand this case to the district court for a current ruling on whether standing and other threshold Article III requirements are satisfied."); *cf. El–Fadl v. Central Bank of Jordan,* 75 F.3d 668, 676 (D.C.Cir.1996) (remanding because "even though El–Fadl's present jurisdictional allegations are insufficient, he has sufficiently demonstrated that it is possible that he could supplement them through discovery"); *Edmond v. United States Postal Serv. Gen. Counsel,* 949 F.2d 415, 425 (D.C.Cir.1991) (remanding after concluding that "it is an abuse of discretion to deny jurisdictional discovery" in light of allegations suggesting jurisdiction); *Crane v. Carr,* 814 F.2d 758 (D.C.Cir.1987) (similar). Here, the record suggests at least one way in which the appellees *may* be able to establish their standing. At oral argument the appellees' counsel suggested that the Committee report might be used by the Department to continue NIF's construction or might otherwise affect the future operation of NIF. In turn, certain appellees who live near LLNL could have an increased exposure to hazardous substances that may be emitted during the ignition process. *See* Oral Argument of 3/13/98 Tr. 52–53. If adequately supported through discovery, such threatened injuries might establish their standing. *Cf. Community for Creative Non–Violence v. Pierce,* 814 F.2d 663, 666 (D.C.Cir.1987) ("For appellants to establish standing in this case, therefore, they must allege (1) an injury that is (2) fairly traceable to the HUD Report and (3) likely to be redressed by a judicial decision rescinding the Report."). At this stage, however, their complaint and affidavits do not explain how forbidding the Department from using the Committee report likely would redress their exposure injury or how the Department's use of the report will make it more likely that some of them could be exposed to increased emissions of hazardous substances.[4] *Cf. Community for Creative Non–Violence,* 814 F.2d at 669 ("[A]ppellants must show that the agency's action is more than only one of the many factors whose relative influence may affect the third parties' behavior."); *id.* ("[S]atisfying [the redressability] aspect of the standing inquiry entails more than simply alleging facts that indicate that the withdrawal and rescission of the report will make a difference because it will remove one influence possibly motivating third parties' injurious actions."); *Physicians' Educ. Network, Inc. v. Dept. of HEW,* 653 F.2d 621, 627 (D.C.Cir.1981); *cf. Florida Audubon Soc'y,* 94 F.3d at 664 ("[T]he [Supreme] Court has

---

4. To the extent the appellees' injury stems from the effect of the report on the Department's decision to build NIF, their claims appear to suffer from a fatal causation defect: the Department's use of the report cannot be responsible for their injury because the Department decided to proceed with construction without reference to the Committee's conclusions. *See United Transp. Union v. ICC,* 891 F.2d 908, 915 (D.C.Cir.1989) ("[S]ince any hypothetical future injury could also occur in the absence of the challenged *ICC* rule, a favorable decision from this court would not be 'likely' to redress it."), *cert. denied,* 497 U.S. 1024, 110 S.Ct. 3271, 111 L.Ed.2d 781 (1990). 'Moreover, even if the appellees can establish standing based on their proximity to NIF and resulting exposure to hazardous emissions, that would provide no basis to enjoin the Department from using those portions of the report that recommend conducting experiments at sites other than LLNL. *See Gulf Oil Corp. v. Brock,* 778 F.2d 834, 842 (D.C.Cir.1985); *Lewis v. Casey,* 518 U.S. 343, 116 S.Ct. 2174, 2183, 135 L.Ed.2d 606 (1996) ("The [injunctive] remedy must of course be limited to the inadequacy that produced the injury-in-fact that the plaintiff has established."); *cf. id.* n. 6 ("But standing is not dispensed in gross. If the right to complain of one administrative deficiency automatically conferred the right to complain of all administrative deficiencies, any citizen aggrieved in one respect could bring the whole structure of state administration before the courts for review.").

never freed a plaintiff alleging a procedural violation from showing a causal connection between the government action that supposedly required the disregarded procedure and some reasonably increased risk of injury to its particularized interest.").[5]

If the district court concludes that the plaintiffs have standing to sue for a use injunction, that conclusion would not *mandate* a judgment in their favor. And unlike the district court, we do not think *California Forestry* may be read to suggest otherwise.

In *California Forestry* we observed that a use injunction

> might be appropriate in some cases, and perhaps even this case, if the unavailability of an injunctive remedy would effectively render FACA a nullity. On remand, however, the district court should inquire whether under the circumstances an injunction would promote FACA's purposes. The preparation of the report has already consumed millions of dollars. If the Forest Service needs a scientific evaluation of the Sierra Nevada for its own use, an injunction prohibiting its use of the SNEP study would require it to commission another (presumably duplicative) study of the Sierra Nevada. That result would not meet FACA's aim to reduce wasteful expenditures. ... A second purpose of FACA is to enhance the public accountability of advisory committees established by the Executive Branch. ... The record indicates that at least some of the Science

Team meetings were open to the public. Furthermore, SNEP made other efforts to keep the public informed—it published newsletters and provided information to a "key contacts group" comprised of eighty-seven individuals and representatives of various organizations, including CFA. The need for injunctive relief may be reduced where, as here, there has been at least some attempt to ensure public accountability.

*California Forestry,* 102 F.3d at 614 (citations and quotations omitted). The district court distilled from this passage a four-part test to decide whether to grant a use injunction: "(1) whether 'the unavailability of an injunctive remedy would effectively render FACA a nullity'; (2) whether an injunction would promote FACA's purposes; (3) whether substantial funds have already been spent, and (4) whether 'there has been at least some attempt to ensure public accountability.'" *NRDC I, supra.* We believe in doing so, it misread the opinion.

■ In *California Forestry* our discussion about whether denial of a use injunction would "render FACA a nullity" was intended to highlight that the relief should be awarded only rarely; we did not mean that if suit is not brought until late in the day, an injunction should necessarily issue to ensure respect for the law. Because of its First Amendment implications, punitive effect and likely standing complications, a use injunction should be the remedy of last resort.

---

**5.** At oral argument the Department also stated that if we uphold the use injunction there is at least "a reasonable possibility" the Department may have to duplicate the efforts of the now-defunct Committee by creating a new committee. *See* Oral Argument of 3/13/98 Tr. 7–8. If so, the use injunction may have the same effect as an injunction directing the Department to establish a new ICF committee that complies with FACA so that the appellees can then participate contemporaneously in the committee's activities—an equitable remedy redressing loss of a past opportunity by mandating provision of a future one. Whether the court can use its equitable power to order a co-equal branch of government to affirmatively perform a discretionary act is a question we leave for another day. *Cf. Swan v. Clinton,* 100 F.3d 973, 976–77 & n. 1 (D.C.Cir.1996) (noting that mandatory injunction against President is appropriate only (1) if petitioner satisfies requirements needed for mandamus relief and

(2) if injunction will compel performance of "ministerial" rather than discretionary obligation).

In any event, their current allegations do not suggest they will be injured by the withholding of a use injunction because it will deprive them of the "reasonable possibility" that they can participate in the activities of a reconstituted committee in the future. *See Steel Co.,* — U.S. at —, 118 S.Ct. at 1020 ("Because respondent alleges only past infractions of [the statute], and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury."); *Fair Employment,* 28 F.3d at 1272 ("[T]he tester plaintiffs['] ... federal claims reduce to their request for injunctive or declaratory relief. Yet ... they lack standing to seek such prospective relief, for they have not made sufficient allegations that they are threatened with any future illegality.").

While denying a use injunction may leave a plaintiff without an effective remedy, that circumstance cannot determine the plaintiff's ultimate entitlement to the relief. If the plaintiff has failed to prosecute its claim for injunctive relief promptly, and if it has no reasonable explanation for its delay, the district court should be reluctant to award relief. *Cf. Independent Bankers Ass'n v. Heimann*, 627 F.2d 486, 488 (D.C.Cir.1980) ("The venerable maxim *vigilantibus non dormientibus aequitas subvenit* (equity aids the vigilant, not those who slumber on their rights) requires that a suit in equity, though otherwise meritorious, be dismissed if two requirements are met: (1) unreasonable delay in bringing the claim for relief and (2) prejudice caused by the delay."). On the other hand, if the defendant is responsible for the delay, or if it has acted to deprive the plaintiff of effective relief, the district court should weigh that in providing a remedy.[6]

■ The district court should also consider whether FACA's principal purposes—(1) avoidance of wasteful expenditures and (2) public accountability—will be served by granting a use injunction. While a complaint filed after a committee has completed its meetings and is in the process of wrapping up its affairs will likely produce waste if a use injunction is granted, the district court should also consider the magnitude of the waste, the value of the committee's work to the sponsoring federal agency and the effect of the FACA violation on the committee's findings. As to the last, if the FACA violation appears to have had little deleterious effect on the committee's output and accountability and the public's participation, the district court should withhold a use injunction.[7] For example, where, as here, a large part of the Committee's deliberations involved classified materials to which the public would not have had access even under FACA, the loss of public participation is less significant. Similarly, the district court's public accountability inquiry should focus on the actual deprivation resulting from non-compliance. Substantial efforts to include members of the interested public in at least some committee meetings and attempts to screen for conflicts of interest among committee members counsel against a use injunction. Moreover, if members of the public will have another opportunity to comment on an agency decision, the district court should determine whether the subsequent opportunity will render harmless (or at least less harmful) the loss of any past opportunity to participate.[8] *Cf. National Nutritional Foods Ass'n v. Califano*, 603 F.2d 327, 336 (2d Cir.1979) (Friendly, J.)

6. Unlike the district court, we do not think denying a use injunction would "render FACA a nullity." The court's funding injunction ensured against future violations by the Committee and, indeed, prompted its dissolution. The declaratory relief provided the appellees and others ammunition for their attack on the Committee's findings. Further, an injunction directing the Academy and the Department to disclose Committee records and documents to the full extent permitted by FACA, which was plainly within the district court's power, *see Public Citizen, supra*, would have redressed any informational injury they may have sustained. All of this constitutes "effective relief" for FACA violations and, although it does not redress their "contemporaneous participation" injury, we have never intimated that partial relief would "render FACA a nullity."

7. The Administrative Procedure Act directs a reviewing court to take "due account" of "the rule of prejudicial error." 5 U.S.C. § 706. If a complaint is not filed until after a committee has completed its work, a district court can do this by looking to the effect of the FACA violation on the committee's work.

8. A future opportunity may create a causation problem in the standing inquiry. If a report produced in violation of FACA cannot be acted on by the agency without first undertaking a rulemaking or adjudication, the plaintiff may have difficulty showing the FACA violation is responsible for a concrete injury it has sustained or will sustain based on the administrative decisionmaking process. *See Metcalf v. National Petroleum Council*, 553 F.2d 176, 188 (D.C.Cir. 1977) ("One would hope that any governmental entity which formulates national policy, be it DOI, FEA, the Congress or any other group, would seek out, consider and balance all available information before arriving at final decisions. In this case, appellant Metcalf seeks to eliminate or alter a particular source of information so that he can produce what he believes to be the 'best legislative product.' ... If subjective feelings of injury were sufficient to confer standing, the rather drastic consequences of a curtailed information flow could result quite easily and often.").

("Applicable rulemaking procedures afford ample opportunity to correct infirmities resulting from improper advisory committee action prior to the proposal."). The appellees who live near LLNL presumably had the opportunity to comment on NIF's Programmatic Environmental Impact Statement—a study specifically addressed to the kind of adverse environmental effects they fear will be produced by NIF's construction and operation. Further, Tri–Valley CAREs has highlighted its long-standing involvement with LLNL health and safety issues:

> Tri–Valley CAREs has a long-held interest in the proposed National Ignition Facility, and has—via gathering written information, conducting meetings with technical experts and other means—systematically carried out research regarding the NIF since 1994. These activities by Tri–Valley CAREs have included, but are not limited to, participation on the LLNL NIF Environment, Safety and Health Working Group, testimony at public hearings on environmental, nuclear proliferation and other questions regarding NIF and numerous meetings with DOE and LLNL officials.

Kelley Decl. ¶ 10.

### III. CONCLUSION

We reverse and remand the case to the district court to consider further the plaintiffs' standing to sue for a use injunction pursuant to *Public Citizen* and to allow the plaintiffs an opportunity to undertake discovery. On remand, and following discovery, the district court should determine if the plaintiffs have standing and, if so, it should consider whether other injunctive relief would redress their alleged injuries.

*So ordered.*

