**ANIMAL LEGAL DEFENSE FUND, INC., et al., Appellants,**

v.

**Donna E. SHALALA, et al., Appellees.**

**No. 96–5011.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 2, 1996.

Decided Jan. 10, 1997.

Eric R. Glitzenstein, Washington, DC, argued the cause for appellants, with whom Katherine A. Meyer, Washington, DC, and Valerie J. Stanley, Rockville, MD, were on the briefs.

Alisa B. Klein, Attorney, United States Department of Justice, Washington, DC, argued the cause for appellees Donna Shalala et al., with whom Frank W. Hunger, Assistant Attorney General, Eric H. Holder, Jr., United States Attorney, and Mark B. Stern, Attorney, United States Department of Justice, were on the brief. Patricia A. Millett, Attorney, Los Angeles, CA, entered an appearance.

Richard A. Meserve, Washington, DC, argued the cause for appellee National Academy of Sciences, with whom Elliott Schulder, James R. Wright and Audrey Byrd Mosley were on the brief. John F. Duffy, Fresno, CA, entered an appearance.

Before: SILBERMAN, GINSBURG, and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellants challenge the district court's determination that a National Academy of Sciences committee, which promulgates and revises a guide on the care and use of laboratory animals for government agencies, is not subject to the Federal Advisory Committee Act because it is not "utilized" within the meaning of the statute. We reverse.

## I.

The National Academy of Sciences (NAS), Appellee–Intervenor, was chartered by Congress in 1863 and has a duty to, "whenever called upon by any department of the Government, investigate, examine, experiment, and report upon any subject of science or art." 36 U.S.C. § 253 (1994). The Academy's principal operating arm is the National Research Council, which includes as one of its subcomponents the Institute for Laboratory Animal Resources. For over four decades, the Research Council and the Institute

have produced for the federal government the *Guide for the Care and Use of Laboratory Animals,* a scientific manual which includes guidelines for handling and monitoring the treatment of laboratory animals.

Although the *Guide* is distributed and referenced throughout the world, some of its primary users are federal agencies that have statutory duties to ensure that research laboratory animals are treated properly. Health and Human Services regulations, for instance, actually require that institutions funded by the National Institute of Health follow the most recent version of the *Guide* in adopting programs involving laboratory animals. *See* 48 C.F.R. § 380.205(a)(1) (1995). The United States Department of Agriculture has also incorporated the *Guide*'s recommendations into regulations. *See* 56 Fed.Reg. 6,428 (Feb. 15, 1991). The Interagency Research Animal Committee, which consists of representatives from each federal agency that uses animals in research, refers readers of its government-wide *Principles for the Utilization and Care of Vertebrate Animals Used in Testing, Research and Training* to the *Guide* as an aid to the interpretation and execution of the *Principles.*

The most recent revision of the *Guide*—the 7th edition—is again being produced by a committee of the Research Council and the Institute (the "Guide Committee"). The Institute selected 16 individuals to serve on the Committee based on the recommendations of academics, industry scientists, toxicologists, veterinarians, members of the Academy, and others. A majority of the members are scientists of national stature who use animals in research and possess expertise in various areas of science, ethics, veterinary medicine, and animal welfare. The Institute had decided to revise the *Guide* at a workshop it convened in 1991, so it submitted a grant proposal to the NIH, which approved the grant in 1993. Representatives of the NIH and other federal agencies attended the Committee's first meeting and recommended new issues to be addressed by the updated *Guide,* but no federal agency further involved itself in the Committee's deliberative process. The Academy's rules on confiden-

tiality prevented Committee members from discussing the substance of the Guide with representatives of the sponsoring agencies. The NAS informed the public of the Guide Committee's appointment and held public forums, but the Committee denied public access to its deliberative meetings.

Appellants, the Animal Legal Defense Fund, Psychologists for the Ethical Treatment of Animals, and the Association of Veterinarians for Animal Rights, sought access to those meetings and to any minutes, transcripts, or records of the Committee under the Federal Advisory Committee Act, 5 U.S.C.App. §§ 1–15 (1994) (FACA). Appellants named as defendants, individually and collectively, HHS, the Public Health Service, and NIH (collectively, "the government"). The NAS subsequently intervened as a codefendant. The district court denied appellants' motion for a preliminary injunction to attend the meetings, and their appeal from that order was dismissed as moot when four days before oral argument the Committee conducted its final meeting, leaving nothing to enjoin. *Animal Legal Defense Fund v. Shalala,* 53 F.3d 363 (D.C.Cir.1995). On remand, the district court granted the defendants' motion for summary judgment, concluding that the Guide Committee was not an "advisory committee" subject to FACA because it was not "established or utilized by one or more agencies." Federal Deposit Insurance Act, § 3(2)(C), 5 U.S.C.A.App. 2.

## II.

Congress enacted FACA in 1972 to control the establishment of advisory committees to the federal government and to allow the public to monitor their existence, activities, and cost. *See Public Citizen v. United States Dep't of Justice,* 491 U.S. 440, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989). The statute states:

For the purpose of this Act—

\*　　\*　　\*　　\*　　\*　　\*

(2) The term 'advisory committee' means any committee, board, commission, council, conference, panel, task force, or other similar group, or any subcommittee or other subgroup thereof (hereafter in this para-

graph referred to as 'committee'), which is—

(A) established by statute or reorganization plan, or

(B) established or utilized by the President, or

(C) established or *utilized* by one or more agencies,

in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government except that such term excludes (i) the Advisory Commission on Intergovernmental Relations, (ii) the Commission on Government Procurement, and (iii) any committee which is composed wholly of full-time officers or employees of the Federal Government.

5 U.S.C.App. § 3 (emphasis added). It is quite obvious that the Committee was and is *used* by HHS, but the term "utilized" was given a very narrow interpretation by the Supreme Court in *Public Citizen.* In so doing, however, the Court indicated quite explicitly in an extensive discussion, which appellants emphasize, that advisory committees formed by the NAS were precisely the sort of advisory committees that would be covered by the Act. *See Public Citizen,* 491 U.S. at 462–63, 109 S.Ct. at 2570–71. The government and the NAS respond that the Supreme Court's discussion regarding the NAS in that opinion was only dictum; the status of the NAS committee was not really in issue in that case, and therefore this case is governed by subsequent opinions of our court, particularly *Washington Legal Found. v. United States Sentencing Comm'n,* 17 F.3d 1446 (D.C.Cir.1994), and *Food Chem. News v. Young,* 900 F.2d 328 (D.C.Cir.), *cert. denied,* 498 U.S. 846, 111 S.Ct. 132, 112 L.Ed.2d 99 (1990), both of which applied *Public Citizen* and adopted a "management and control" test to determine whether a committee not established by a government agency is nevertheless "utilized." It is indisputable that no government agency could be thought to exercise that degree of influence over the Guide Committee.

The case before us, then, turns on a careful reading of these three previous cases. We start naturally with *Public Citizen.* The is-

sue before the Supreme Court was whether FACA covered the ABA's Standing Committee, which although not "established" by the government, had been for many years formally consulted by the Justice Department, on behalf of the President, as to the relative qualifications of individuals whom the Administration intended to nominate for federal judgeships. Since the Standing Committee solicited views of lawyers, judges, and others on a confidential basis, and its deliberations were also supposed to be confidential, it was argued that the application of FACA to it would be its death knell. FACA requires that committees file charters, notify the public in advance of meetings, open the doors to those meetings to all comers, keep detailed minutes, and perhaps most onerous, make documents available for public inspection subject to Freedom of Information Act limitations. 5 U.S.C.App. §§ 9(c), 10(a)–(c). An application of those requirements allegedly would have made it impossible for the Standing Committee to continue to operate.

Justice Brennan, writing for the majority, observed that the statute "[r]ead unqualifiedly ... would extend FACA's requirements to any group of two or more persons, or at least any formal organization, from which the President or an executive agency seeks advice." 491 U.S. at 452, 109 S.Ct. at 2566. It should be noted that the "definition" in the statute never fully explains what *is* an advisory committee; this is why the majority (and the dissenters) in *Public Citizen* thought that determining whether a private group consulted by the executive branch was a FACA advisory committee—thus triggering all the requirements of the statute—depended entirely on the meaning of one word: utilize.

The Court reasoned, drawing upon legislative history, that Congress did not intend that every time the President consulted the NAACP on an appointment to the EEOC, or the leaders of an American Legion Post for their opinion of military policy, or the presidential party's National Committee on Cabinet appointments, that an advisory committee charter be prepared and minutes kept of the meeting. The Court therefore further canvassed the legislative history to find the

limiting principle to determine what sort of private group could be thought "utilized" as an "advisory committee." (The word "utilized" had to be given some meaning.) That "legislative history" included a previous executive order and the proceedings of the Congress prior to the one which passed the Act. The Court concluded that Congress intended to extend the requirements of the Act beyond those committees *established* by the government only to private groups that were used by the President or an executive branch agency *in the same manner* as advisory groups established by the government.

At that point, there is a gap in the Court's stated reasoning; it was not explained why the ABA Standing Committee was *not* employed in the same way as a government-established advisory committee.[1] The Court simply asserted that "[t]here is no indication in the [House] Report that a purely private group like the ABA Committee that was not formed by the Executive, *accepted no public funds,* and assisted the Executive in performing a constitutionally specified task ... was the type of advisory *entity* that legislation was urgently needed to address." 491 U.S. at 460, 109 S.Ct. at 2570 (emphases added).

Instead, according to the Court, the House Report and Congress intended to cover, by use of the word "utilized," committees like those established by the National Academy of Sciences. NAS Committees were the "paradigmatic example" because the NAS is a "quasi-public organization in receipt of public funds." *Id.* at 460, 109 S.Ct. at 2570. The Court thereafter repeatedly referred to the NAS—and its committees—as the example of the organization Congress had in mind as "offspring of [an] organization created *or permeated* by the Federal Government." *Id.* at 463, 109 S.Ct. at 2571. In other words, the definition given by the Court to an advisory committee utilized by the federal government focuses not so much on *how* it is used but whether or not the character of its

creating institution can be thought to have a quasi-public status.[2]

Still, both the government and the NAS argue that we are not bound by the Court's conclusion that NAS committees are the paradigm encompassed by the term utilized—and thus covered by the Act. The NAS points out that the Supreme Court did not consider the deleterious effects of FACA's requirements on its deliberative processes: As the NAS sees it, open meetings and records would compromise its internal review procedures and inhibit candid exchange among its members. And the NAS contends that the Supreme Court's analysis of the legislative history is flawed because it relied on the deliberation of a prior Congress (and a preexisting executive order addressing advisory committees), which should not be thought probative of the views of the enacting Congress. We admit that we are not admirers of the Court's techniques in exploring the legislative history (or indeed on its extensive reliance on legislative history itself), but we are in no position, hierarchically, to reject the Court's approach.

The NAS calls to our attention a piece of legislative history favorable to it—but not mentioned by the Supreme Court: Just before the House voted to enact the bill, the Chairman of the Committee that developed the legislation, Mr. Holifield, seemed to indicate that the NAS was not to be included within the coverage of the Act.

> Mr. Horton: Am I correct in the understanding that this bill does not apply to such organizations as the National Academy of Sciences and its various committees which make studies and submit reports to Federal agencies on request?

> Mr. Holifield: The gentleman is quite correct. If he will refer to the joint explanatory statement of the committee of conference [the Conference Report on FACA] at

---

1. The Standing Committee purported to be non-partisan, although in recent times that proposition has been in dispute. *See Association of American Physicians and Surgeons, Inc. v. Clinton,* 997 F.2d 898, 906 n. 4 (D.C.Cir.1993).

2. The Court went on to reason that its restricted definition of utilize is necessary to avoid the constitutional question—interference with the President's appointment power—that the dissent would have decided. *Id.* at 465–67, 109 S.Ct. at 2572–73.

page 10, the first full paragraph, it states as follows:

> The Act does not apply to persons or organizations which have contractual relationships with Federal agencies nor to advisory committees not directly established by or for such agencies.

As the gentleman knows, the National Academy of Sciences was founded by Congress and, therefore, it comes under that category.

> Mr. Horton: So, it would be excluded?

> Mr. Holifield: That is correct.

118 CONG. REC. 31,421 (1972). Chairman Holifield's answer appears to be something of a non sequitur and this sort of parliamentary dialogue is not the most reliable form of legislative history. Moreover, this dialogue appeared in a district court opinion, *Lombardo v. Handler*, 397 F.Supp. 792, 799 (D.D.C. 1975), *aff'd mem.*, 546 F.2d 1043 (D.C.Cir. 1976), *cert. denied*, 431 U.S. 932, 97 S.Ct. 2639, 53 L.Ed.2d 248 (1977), squarely holding that an NAS committee was *not* subject to FACA, of which the Supreme Court was surely aware. Indeed, it was cited, albeit in a footnote, in the *amicus* brief filed by the People for American Way upon which the Supreme Court heavily relied. That it was not mentioned in the opinion, we must *presume*, indicates that the Supreme Court did not think it significant.

We agree with appellees nevertheless that the Supreme Court's analysis is not, strictly speaking, a holding that NAS committees are FACA advisory committees. What *is* part of the holding however, is its conclusion that by employing the term "utilized," in addition to "established," Congress had in mind an extension of the Act's coverage to include the offspring of "quasi-public" organizations "permeated by the Federal government." *Id.* at 460, 463, 109 S.Ct. at 2570, 2571. After all, that is the only sort of advisory committee the Court recognized as reached by the term "utilized." Unfortunately for appellees, they are not able to point to any other organization that fits this category more readily.

In that regard, we think appellees' argument and the district court's conclusion that the NAS is not really a "public" corporation is quite beside the point. It is irrelevant that, as the district court pointed out, the NAS charter specifically provides that it is "a private corporation," or that it lacks regulatory authority, or that its employees are not employed by the United States Government, or that the United States Government has no seats on the Academy's Board nor power to choose its officers nor appoint members of its committees. This argument assumes that there is some sort of pre-existing definition of "quasi-public" to which the *Public Citizen* Court referred when it discussed quasi-public organizations. But quasi-public does not have an independent meaning divorced from the Court's reference in *Public Citizen*. The term merely stood for a set of qualities that the Court thought critical. And the NAS is imbued with those very characteristics: What mattered to the Court was whether the organization was "purely private," who formed and funded it, and whether it was formed "for the explicit purpose of furnishing advice to the Government." 491 U.S. at 460 n. 11, 109 S.Ct. at 2570 n. 11. The NAS was created by Congress to answer the government's requests for investigations, examinations, experiments, and reports, 36 U.S.C. § 253, and the government takes care of the expenses associated with performing these tasks.

It follows that the district court's reliance on *Lebron v. National RR Passenger Corp.*, 513 U.S. 374, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995), holding that Amtrak is a government entity for purposes of the First Amendment, is wholly misplaced. Whether an organization has sufficient *governmental characteristics* to implicate the First Amendment is hardly the same question (nor does it even bear on the issue) as whether an organization is quasi-public for purposes of the Supreme Court's analysis in *Public Citizen*. In *Public Citizen*, the Court asked only whether particular committees asserted to be "utilized" by the government as FACA advisory committees were formed (established) by a nongovernmental organization that was "created or permeated by the Federal Government." 491 U.S. at 463, 109 S.Ct. at 2571. It is almost redundant—in light of the Court's reasoning from its perception of the NAS'

characteristics—for us to conclude that NAS committees pass that test.

We see no real tension between appellants' reading of *Public Citizen*, with which we agree, and our two cases on which appellees rely. In *Food Chemical News v. Young*, we encountered a committee of a wholly *private* organization, the Federation of America Societies for Experimental Biology (a major biomedical research organization), 900 F.2d at 329. We held that its committee, which advised the FDA, was not an advisory committee *utilized* by the federal government because it "was not amenable to [any] management by [FDA] officials," *or* "by [any] semiprivate entity the Federal Government helped bring into being." 900 F.2d at 333 (quoting *Public Citizen*, 491 U.S. at 457–58, 463, 109 S.Ct. at 2568, 2571). By so doing, we actually extended slightly, rather than, as the government contends, restricted, the meaning of a "utilized advisory committee" that the Supreme Court gave in *Public Citizen*. The Court's opinion could have been read to imply that *no* purely private committees could be FACA advisory committees. We recognized, however, that if a government agency actually took over the management of such a committee, it would be brought under FACA. But we also recognized, as indeed we were compelled to do by the Supreme Court's *Public Citizen* opinion, that if a committee advising the government were established by a "semiprivate" (read: quasi-public) agency instead of a government agency, it would meet the alternative test set forth by the Supreme Court.

In *Washington Legal Found. v. United States Sentencing Comm'n*, it was claimed that an "Advisory *Working Group* on Environmental Sanctions," 17 F.3d at 1447 (emphasis added) (a committee by any other name is still a committee), established by the U.S. Sentencing Commission was covered by FACA. The primary issue in the case was whether the Sentencing Commission was an "agency" within the meaning of FACA. We held that it was not because FACA exempted the courts of the United States; the Sentencing Commission is part of the judicial branch and, in any event, Congress meant the Sentencing Commission to be excluded from the Administrative Procedure Act, which determines FACA coverage. *Id.* at 1447–48.

The alternative argument presented in *Washington Legal Foundation* was that the Department of Justice had two members on the "working group" (presumably the product of their deliberations was shared by the Department) and therefore the committee was utilized within the meaning of FACA. We dismissed this argument, stating that the utilized test is a stringent standard, denoting "something along the lines of *actual management or control* of the advisory committee." *Id.* at 1450 (emphasis added). Appellees, and the district court, believe that by so stating we narrowed the *Public Citizen* test so that no advisory committee, including one established by a quasi-public organization, could be deemed utilized unless the circumstances met the management and control by the government test.

We think appellees and the district court badly overread our opinion. We did not even refer to the alternative prong of the utilize test that comes from *Public Citizen*, i.e., whether an organization that establishes an advisory committee can be described as quasi-public. We quoted only the first prong drawn from *Food Chemical News v. Young*, "so closely tied to an agency as to be amenable to strict management by agency officials," *id.* at 1451 (internal quotation omitted), ignoring the second part of the full *Young* sentence: or "by [any] semiprivate entity the Federal Government helped bring into being." 900 F.2d at 333. We obviously thought the case did not raise an issue similar to the instant case. Certainly, the Sentencing Commission, which established the working group, is more than a *quasi*-public organization; it is itself a governmental entity. But it would have been anomalous, once having concluded that advisory committees directly established by the Sentencing Commission were exempt from FACA, to decide that they could nevertheless lose their exemption if their deliberations were passed on to the Department of Justice *because* of the Sentencing Commission's public status. That result would surely pervert congressional intent. In short, the quasi-public prong simply did not have any relevance to

the Sentencing Commission case. That is why we focused *only* on the question whether the Justice Department itself could be said to manage and control the working group. In that event, the *Young* standard would be met and, as a corollary, the exemption for Sentencing Commission advisory committees would not properly apply.

\*    \*    \*    \*    \*    \*

To sum up, under *Public Citizen,* the Guide Committee must be regarded as utilized by HHS because HHS relies on its work product and because it was formed by the NAS, a quasi-public entity. Nothing in our two cases undermines that conclusion. Accordingly, we reverse the district court's grant of summary judgment for the government and remand so that the district court may determine whether there are documents to which the appellants may obtain access under FACA and whether other injunctive relief should issue.

*So ordered.*