HOLY CROSS NEIGHBORHOOD
ASSOCIATION, et al.

v.

Colonel Thomas F. JULICH, et al.

Nos. Civ.A.00–1725, Civ.A.00–
1765, Civ.A.00–1837.

United States District Court,
E.D. Louisiana.

July 28, 2000.

William Patrick Quigley, New Orleans,
Daria Burgess Diaz, Osborne, McComis-
key & Diaz, LLP, Metairie, LA, for Plain-
tiffs in No. 00–cv–1725.

Spencer Livingston, Denise N. Petti-
john, New Orleans, LA, for Plaintiffs in
No. 00–cv–1765.

Peter Newton Freiberg, Smith, Jones &
Fawer, David A. Marcello, New Orleans,
LA, for Plaintiffs in No. 00–cv–1837.

Fred Turner Hinrichs, U.S. Attorney's
Office, New Orleans, LA, for Defendants
in Nos. 00–cv–1765, 00–cv–1725.

Marshall G. Weaver, Henican, James &
Cleveland, Metairie, LA, Akello Patrice
Dangerfield, Spears & Spears, New Or-
leans, LA, for Defendants in No. 00–cv–
1837.

## ORDER AND REASONS

CLEMENT, District Judge.

Before the Court are Defendants' Motion for Summary Judgment and Plaintiffs' Motion for Preliminary Injunction. For the following reasons, both Motions are DENIED.

### A. BACKGROUND

This litigation arises out of the formation of the Community–Based Mitigation Committee ("CBMC"), which was created to offer advice as to how the Army Corps of Engineers ("Corps") could best mitigate the negative impact to the community of the Industrial Canal lock modernization project in New Orleans, Louisiana. The Plaintiffs, who consist of several individuals and community organizations, contend that the CBMC is an "advisory committee" within the meaning of the Federal Advisory Committee Act, 5 U.S.C.App. 2 §§ 1–15 ("FACA"), because, they argue, it was established or utilized by the Corps pursuant to Congressional directive in the interest of obtaining advice or recommendations as to the creation of a community impact mitigation plan. Accordingly, Plaintiffs bring suit to compel the Corps to abide by FACA's requirements. Relying primarily on two opinions from the D.C. Circuit which interpret FACA,[1] the Corps responds that it neither established nor utilized the CBMC and, therefore, that the CBMC is not a FACA advisory committee. Accordingly, the Corps opposes Plaintiffs' motion for a preliminary injunction and moves for summary judgment.

The Inner Harbor Navigational Canal, commonly referred to as the "Industrial Canal," serves as a vital link in the Gulf Intracoastal Waterway System, making navigation between the Mississippi River in New Orleans and the Gulf Intracoastal Waterway and Mississippi River–Gulf Outlet possible. Since at least 1960, the Corps has contemplated upgrading the connecting channel and replacing the Canal's existing lock, which has been in operation since the 1920s and, in the Corps' opinion, has become obsolete. The Corps has devised a plan to accomplish these modernization goals, which, by all accounts, will be a major undertaking that will significantly impact the communities surrounding the Canal.

Out of concern for this impact, the House and Senate Appropriations Committees recommended that the Corps involve the community in the lock modernization project. In their 1991 reports, the Committees directed the Corps to "develop a comprehensive plan to identify and mitigate to the maximum extent practicable any adverse social and cultural impacts of the project." H.R. Rep. No. 101–536, at 28 (1991); S. Rep. No. 101–378, at 26 (1991). The Committees also directed the Corps "to implement a community participation process with affected residential, business, and governmental entities," which "shall include involvement of representatives of existing community associations and business groups in the areas adjacent to the Industrial Canal as well as representatives of local government." H.R. Rep. No. 101–536, at 28; S. Rep. No. 101–378, at 25–26. As part of the process, the Committees directed the Corps to "designate an advisory group for the purposes of exchanging information and receiving community opinion and advising the District Engineer on various aspects of the project." H.R. Rep. No. 101–536, at 28; S. Rep. No. 101–378, at 26.

In 1996, Congress passed legislation requiring the Corps to develop a "community impact mitigation plan." Section 326 of the Water Resources Development Act 1996, Pub.L. No. 104–303, 110 Stat. 3658, states in part that

the Secretary shall implement a comprehensive community impact mitigation plan, as described in the evaluation re-

---

**1.** *Byrd v. United States Environmental Protection Agency,* 174 F.3d 239 (D.C.Cir.1999), and *Food Chemical News v. Young,* 900 F.2d 328 (D.C.Cir.1990).

port of the New Orleans District Engineer dated August 1995, that, to the maximum extent practicable, provides for mitigation or compensation, or both, for the direct and indirect social and cultural impacts that the project ... will have on the affected areas....

The District Engineer report referenced in the 1996 Act states in pertinent part:

To ensure that the mitigation plan is effectively implemented with full consideration and coordination with the neighborhoods, a neighborhood oversight committee will be established to oversee implementation of the mitigation features. Representatives of the four (4) affected neighborhoods that reside in the area will serve on the committee in an advisory capacity. In addition, specialists and/or professionals working on specific community issues will also be invited to assist the committee as advisors. The two city councilpersons representing each side of the canal will also be invited to participate. This represents the framework of a process that could be used. Details of the committee will be finalized during future coordination that would continue through the design and construction phases of the project.

In the wake of these Congressional directives, the Corps decided that a "Community–Based Mitigation Committee" should be formed. How this CBMC was formed is at the epicenter of this controversy.

It is undisputed that the Corps decided to hire a private contractor to play a role in the CBMC's formation. In a Public Notice which appeared in the New Orleans *Times–Picayune* on April 3, 1999 the Corps announced its intention to develop a "Community Impact Mitigation Plan." The Notice stated that "Community involvement is required, and this Public Notice seeks proposals for a contractor(s) to carry out this feature." According to the Notice, the successful contractor(s) "will serve the lead role in the establishment of a Community–Based Mitigation Committee (CBMC) and the development of a Partnering Agreement," and, among other duties, will "serve as facilitator(s) for the CBMC in its proceedings, including the development of the mitigation plan recommendations and annual program reviews."

The Corps states that it received nine proposals in response to its Public Notice and, using the "best value" method of evaluation, selected a consultant team led by Gregory C. Rigamer and Associates, Inc., which refers to itself in the lower case as "g.c.r." The team also included Metro Source, L.L.C., the University of New Orleans and the New Orleans Area Habitat for Humanity.

On September 30, 1999 the Corps and g.c.r. signed a contract, which set forth its requirements in a series of "phases." Phase 1 required g.c.r. to prepare a "plan of action," consisting of g.c.r.'s "recommendations for the selection of potential CBMC members and advisors, and the preparation of a draft Partnering Agreement." The purpose of the Partnering Agreement, which plays a central role in this litigation, was to obtain a commitment from everyone involved in creating the mitigation plan to work together in good faith for the benefit of the community, despite any opposition to the lock modernization project itself. Phase 2 required g.c.r. "to take the lead role in the establishment of the CBMC" and to work "in partnership with the [New Orleans District] to recruit committee members and advisors." Phase 3 involved the development of the "needs assessment" and the "first three-year program." The objective of the needs assessment, which g.c.r. was to facilitate, was for the "CBMC to update previous studies and identify current community needs in reference to project impacts and opportunities." Contemporaneously, g.c.r. was to facilitate the CBMC's "recommendations for the first three years of the Community Impact Mitigation Plan." Phase 3 also required g.c.r. to provide administrative, technical and profes-

sional support to the CBMC.[2] Upon completion of the needs assessment and first three-year program recommendations, g.c.r. must submit a report "summarizing the results of the assessment and providing detailed recommendations for the first three-year mitigation program." The contract provides that all of g.c.r.'s "efforts will be performed with approval authority resting with the New Orleans District."

According to the available evidence, in forming the CBMC, g.c.r. contacted numerous organizations, which were requested to appoint their own representative to the committee. The contract and g.c.r.'s plan of action indicate that these organizations were identified by g.c.r. and their selection was subject to the approval of the Corps.[3] Meanwhile, g.c.r. also established a public application process in order to select at-large members from the affected neighborhoods. The organizational representatives had veto power over g.c.r.'s recommendations for at-large members.

Once assembled, g.c.r. held a workshop for the CBMC on February 12, 2000. In attendance were representatives from the Holy Cross Neighborhood Association, the By-water Neighborhood Association, the Lower Ninth Ward Neighborhood Council, the Desire/Florida Area Community Council, the St. Claude Merchants Association, the Holy Cross School and St. Bernard Parish, as well as a faith-based representative, the at-large members, and Corps personnel. The purpose of the workshop was twofold. First, the CBMC was to come to a consensus on a "Partnering Agreement," a draft form of which was provided by g.c.r. Second, the CBMC was to set the rules and guidelines for its proceedings.

On February 24, 2000 the Corps and the majority of the members of the CBMC entered into the first three sec-

tions of the Partnering Agreement.[4] According to the Agreement, the role of the Corps in the mitigation process includes ensuring "maximum feasible community participation in the mitigation process" and the faithful implementation of the "provisions of the Corps-approved Community Impact Mitigation Plan developed by the CBMC." Its responsibilities include ensuring maximum feasible participation of the affected community through the CBMC process; providing technical assistance and facilitation support to the CBMC to ensure informed decision-making; attending the CBMC meetings to answer questions and provide information and otherwise participate as appropriate in the proceedings of the committee to ensure an open and continuous dialogue between the parties; carefully reviewing the CBMC recommendations for the Community Impact Mitigation Plan and quarterly updates as available to ensure consistency with Federal laws and regulations, annual funding constraints, and prudent expenditure of authorized mitigation funding; clearly communicating Corps concerns about problematic elements of the Community Impact Mitigation Plan recommendations to the CBMC and allowing for response by the committee; informing the CBMC of Corps approval of the Community Impact Mitigation plan recommendations and implementation plans and schedules; and faithfully implementing the Corps-approved Community Impact Mitigation Plan and providing progress and status reports on a regular basis to the CBMC and the impact community.

Not all of the CBMC members agreed to sign the Partnering Agreement. Three members of the CBMC, including the representatives of the Holy Cross Neighbor-

2. Following Phase 3, the contract provides for three optional phases, which would entail a review of the program and recommendations for extension of the three-year plan.

3. The parties dispute whether the Corps actually exercised its approval authority.

4. The remainder of the Partnering Agreement, which dealt with the CBMC's code of conduct, was finalized on March 30, 2000.

hood Association, refused to sign the Agreement. Consequently, on March 27, 2000, Colonel Thomas F. Julich, the New Orleans District Engineer, sent letters to Mary Patsy Story and Jamal Morelli, the Holy Cross Neighborhood Association representatives, informing them that "signing the Partnering Agreement is a prerequisite for membership on the CBMC." Accordingly, wrote Col. Julich, "only those persons who sign the . . . agreement on or before March 30, 2000, will be allowed to continue to participate as members or alternates on the committee." If they chose not to sign the agreement, Col. Julich informed them that they would "not be allowed to participate in the March 30, 2000, meeting or subsequent meetings," and a "replacement for the community organization or area [they] represent [would] then be sought to complete the CBMC membership." Despite Col. Julich's warnings, Ms. Story and Mr. Morelli refused to sign the Partnering Agreement, and they and the Holy Cross Neighborhood Association were removed from the CBMC.

On March 30, 2000, the CBMC voted to have their working meetings closed to the public. By a 10 to 1 vote, the CBMC approved a member's motion to limit the "working sessions" of the CBMC to its membership with "general public information meetings" scheduled on a periodic basis.

The CBMC's decision to close its meetings provoked the first wave of lawsuits in this litigation. First, on June 13, 2000, the Holy Cross Neighborhood Association, Citizens Against Widening the Industrial Canal, Pamela Dashiell, Mary Patsy Story, and John Keoferl filed a Complaint for Declaratory Judgment and Injunctive Relief against Col. Julich and other Army officers. In their Complaint, Plaintiffs contend that the Corps has violated FACA "by closing the meetings of the . . . CBMC . . . and denying them their statutory right to attend and participate at the CBMC meetings." Plaintiffs seek a declaratory judgment that Defendants are violating

FACA and request a temporary restraining order and preliminary and permanent injunctions requiring the CBMC meetings to be open to the public. On June 15, 2000, Plaintiffs' TRO motion was denied on the grounds that Plaintiffs failed to demonstrate that the CBMC's June 15 closed meeting would result in irreparable injury. The Court deferred ruling on Plaintiffs' motion for a preliminary injunction.

Two additional lawsuits followed. On June 16, 2000, the Association of Community Organizations for Reform Now ("ACORN"), Octavia Turner, and David Leonard filed a Complaint for Declaratory Judgment and Injunctive Relief against the same defendants. ACORN alleges that it attempted to place an organizational representative on the CBMC but was denied. ACORN's Complaint is substantially similar to the Holy Cross Complaint, but seeks only a declaratory judgment and permanent injunction. On June 22, 2000, All Congregations Together ("ACT") filed a Complaint for Declaratory Judgment and Other Relief against Col. Julich and other Army officers, as well as g.c.r., Metro–Source, and the CBMC itself. Like ACORN, ACT alleges that it is not directly represented on the CBMC. In addition to challenging the CBMC's closed meeting policy, ACT also contends that the Defendants have violated FACA and the Corps' Congressional mandate by "failing to compose a citizens committee . . . that is fairly balanced in terms of the points of view represented and the functions to be performed by the citizens committee and by failing to ensure maximum feasible public participation and representation in the committee's project. . . ." Because the determination of whether the CBMC is a FACA advisory committee comprises a material part of all three actions, the Holy Cross, ACORN and ACT suits were consolidated pursuant to Local Rules 3.1 and 3.1.1E.

## B. LAW AND ANALYSIS

Currently before the Court are two motions, Holy Cross' Motion for a Prelimi-

nary Injunction and the Corps' Motion for Summary Judgment. In addition to the memoranda submitted by Holy Cross and the Corps, ACORN filed a Memorandum in Support of Declaratory and Injunctive Relief and in Opposition to Summary Judgment, and ACT filed a Memorandum in Opposition to Motion for Summary Judgment. Because the CBMC's status as a FACA advisory committee is at the crux of both motions, the Court begins with a general exposition of FACA.

1. The Federal Advisory Committee Act

Congress passed the Federal Advisory Committee Act, or FACA,[5] in 1972 to accomplish two main objectives. First, Congress wished to reduce the influence exerted by special interests on agency decision makers through advisory committees. Second, Congress wished to promote administrative efficiency and reduce costs by weeding out unnecessary or obsolete advisory committees. *See* FACA § 2 (findings and purpose); *Public Citizen v. United States Dep't of Justice*, 491 U.S. 440, 445–46, 109 S.Ct. 2558, 2562–63, 105 L.Ed.2d 377 (1989); Steven P. Croley, *Practical Guidance on the Applicability of the Federal Advisory Committee Act*, 10 ADMIN. L.J. AM. U. 111, 117–18 (1996). FACA's various requirements can best be understood in light of these objectives. For example, FACA's requirement that advisory committee meetings be open to the public, at issue here, "facilitate[s] public monitoring of advisory committees, thereby reducing the likelihood that advisory committees can serve as secretive channels for special-interest access to agencies." Croley, 10 ADMIN. L.J. AM. U. at 118; FACA § 10(a).

FACA § 3(2) defines "advisory committee" broadly as

any committee, board, commission, council, conference, panel, task force, or oth-

er similar group, or any subcommittee or other subgroup thereof (hereafter in this paragraph referred to as "committee"), which is-

(A) established by statute or reorganization plan, or

(B) established or utilized by the President, or

(C) established or utilized by one or more agencies,

in the interest of obtaining advice or recommendations for the President or one or more agencies or officers of the Federal Government, except that such term excludes (i) any committee that is composed wholly of full-time, or permanent part-time, officers or employees of the Federal Government, and (ii) any committee that is created by the National Academy of Sciences or the National Academy of Public Administration.[6]

Despite the potential breadth of this definition, not every agency attempt to solicit advice from the public results in the creation of a FACA "advisory committee."[7] In *Public Citizen*, the Supreme Court rejected a plain-meaning interpretation of FACA and instead read the statute narrowly in light of its purposes and legislative history. 491 U.S. at 452–55, 109 S.Ct. at 2566–67. Subsequent lower court decisions have narrowed the scope of FACA's definition of advisory committee even further, prompting Professor Croley of the University of Michigan Law School to note "the government's [striking] record of success" in section 3 cases. 10 ADMIN. L.J. AM. U at 153.

Here, there is little question that the CBMC was a "committee, board, commission, council, conference, panel, task force, or other similar group" formed to provide "advice or recommendations" to the Corps' New Orleans District in developing a com-

---

**5.** FACA is codified at 5 U.S.C.App. 2 §§ 1–15.

**6.** Subsequent statutes have exempted specific advisory committees from FACA's requirements. *See, e.g.,* 29 U.S.C. § 1302(h)(8) (advi-

sory committee to Pension Benefits Guaranty Corporation not subject to FACA).

**7.** These committees are sometimes referred to as "section 3 advisory committees."

munity impact mitigation plan. Indeed, the Partnering Agreement expressly states that the Corps will review the CBMC's "recommendations" for the plan, and the consulting contract states that "the scope of the CBMC is to provide oversight and guidance" to the New Orleans District for the implementation of the plan. The issue here is whether the CBMC was "established" or "utilized" by the Corps within the meaning of FACA.[8] Plaintiffs argue that the CBMC was both established and utilized by the Corps; the Corps disagrees.

### 2. Was the CBMC Established by the Corps?

In two leading cases, *Food Chemical News v. Young*, 900 F.2d 328 (D.C.Cir. 1990) (Ruth Bader Ginsburg, J.), and *Byrd v. United States Environmental Protection Agency*, 174 F.3d 239 (D.C.Cir.1999) (2–1 decision), the D.C. Circuit held that an advisory committee is "established" by a federal agency only if the federal agency *actually* created the committee. *Byrd* is especially relevant to the case at bar.

In *Byrd,* the panel majority rejected the plaintiff's argument that the EPA had "effectively created" an advisory committee by "conceiving of the need for it" and "implementing it by hiring a private consulting firm to handle the logistics." 174 F.3d at 246. Even though the EPA provided a list of suggested panel members and retained "significant potential authority in the panel selection process," the majority held that the plaintiff could not show that the panel was a "Government-formed advisory committee" because the consulting firm, not the EPA, actually selected the panel's membership. *Id.* (citing *Food Chem. News*, 900 F.2d at 332, and *Public Citizen*, 109 S.Ct. at 2570). Thus, establishment within the meaning of FACA depends on what *actually* happened, not on what *could have* happened. *Id.* at 247.

■ In the case at bar, there is no question that the Corps, like the EPA in *Byrd,* retained "significant potential authority" in the committee selection process. The parties disagree over whether the Corps, unlike the EPA in *Byrd,* actually exercised that authority. By affidavit, Gerald J. Dicharry, Jr., Senior Project Manager for the New Orleans District, testified that although the Corps made "general comments" about potential organizational members, it "relied on the advice of gcr [sic] and exercised no veto or ratification of the proposed list of represented organizations" or with respect to the at-large members. Dicharry states that the Corps "did not exercise formal approval of gcr's [sic] recommendations." The Plaintiffs, however, paint a different picture, arguing that the Corps played a substantial and very real role in selecting the CBMC's members. Most significantly, the Plaintiffs point to the letters Col. Julich sent to the Holy Cross Neighborhood Association representatives informing them that they would be removed from the CBMC if they refused to sign the Partnering Agreement. The Corps rebuts the significance of this evidence, however, by asserting that g.c.r. requested that the Corps send these letters, presumably on the assumption that the holdouts would give more weight to a statement from the Corps than from the consulting firm.

The Plaintiffs also argue that g.c.r. was an "agent" of the Corps. "By making g.c.r. its agent," Holy Cross argues, "the Corps retained the right of complete control over g.c.r.'s actions in connection with the CBMC." Plaintiffs believe this retention of "complete control" demonstrates that the Corps actually established the CBMC. Plaintiffs also point to the language in the contract which states that g.c.r. was to serve the "lead role in the establishment of the CBMC," implying therefrom that the Corps intended to and

---

**8.** The parties do make an issue out of the manner in which the CBMC's recommendations will be communicated to the Corps, but this issue goes to whether the CBMC is "utilized" by the Corps.

did play an actual (although not leading) role in the CBMC's establishment.

The Court finds Plaintiffs' agency argument foreclosed by *Byrd*. The consulting firm in *Byrd* clearly could have been characterized as an "agent" of the EPA in implementing its call for an advisory panel. And, just like the consulting firm in *Byrd*, g.c.r. "received a 'task order' or 'work assignment' from the relevant agency defining the objective, the method and the scope" to be used in generating the proposed work product. 174 F.3d at 246. Thus, *Byrd* teaches that an agency relationship does not establish actual control, and the Court rejects this aspect of Plaintiffs' argument as a matter of law.

The letters from Col. Julich, however, create a genuine issue of material fact as to whether the Corps actually exercised its authority in selecting the members of the CBMC.[9] If these letters demonstrate the Corps' actual participation in selecting the CBMC's membership, then the Court might have to conclude that the Corps established the CBMC. Summary judgment is, therefore, improper.

### 3. Was the CBMC Utilized by the Corps?

The Supreme Court's decision in *Public Citizen* centered primarily on the meaning of the term "utilized" within FACA. In a passage often quoted in the FACA jurisprudence, the Supreme Court observed that

"Utilize" is a wooly verb, its contours left undefined by the statute itself. Read unqualifiedly, it would extend FACA's requirements to any group of two or more persons, or at least any formal organization, from which the President or an Executive agency seeks advice. We are convinced that Congress did not intend that result.

491 U.S. at 452, 109 S.Ct. at 2566 (footnote omitted). This observation led the Court to reject a dictionary reading of utilize, opting instead for an interpretation informed by the Act's history and purposes. In light of these factors, the Court concluded that

The phrase "or utilized" ... appears to have been added simply to clarify that FACA applies to advisory committees established by the Federal Government in a generous sense of the term, encompassing groups formed indirectly by quasi-public organizations such as the National Academy of Sciences "for" public agencies as well as "by" such agencies themselves.

491 U.S. at 462, 109 S.Ct. at 2571. The Court then held that, despite the Department of Justice's practice of seeking advice from the American Bar Association Standing Committee on the Federal Judiciary with respect to judicial nominations, the Standing Committee was not a section 3 advisory committee because it was formed privately, received no federal funds, and was not amenable to strict management by agency officials. *See* 491 U.S. at 457–58, 463, 109 S.Ct. at 2568, 2571.

Despite the Supreme Court's use of the term "generous" in *Public Citizen*, it is quite clear that it and the lower courts have interpreted the term "utilized" quite stingily. In *Animal Legal Defense Fund, Inc. v. Shalala*, 104 F.3d 424 (D.C.Cir. 1997), a panel of the D.C. Circuit interpreted *Public Citizen* as setting forth two ways in which an advisory committee can be utilized by an agency within the meaning of the FACA. *See id.* at 430 (stating that there are two prongs of *Public Citizen's* utilize test). First, a committee subject to strict "management and control" by an agency is utilized by that agency. *Id.* at 427. Courts have made clear, however, that "even 'significant' influence does not

---

9. Plaintiffs also argue that the Corps "established" the CBMC because Congress required it to do so. This argument is a non-sequitur. Nonetheless, the Court finds Plaintiffs' argument that Congress mandated the establishment of an advisory committee significant and discusses it below.

represent the level of control necessary to establish that a government agency 'utilized' an advisory panel." *Byrd,* 174 F.3d at 247 (citing *Washington Legal Found. v. United States Sentencing Comm'n,* 17 F.3d 1446, 1450 (D.C.Cir.1994)). Rather, the agency must exercise "something along the lines of *actual* management or control" to fall within the meaning of utilize. *Washington Legal Found.,* 17 F.3d at 1450 (emphasis added).

Second, a committee created by a "quasi-public institution" to provide advice to an agency is utilized by that agency. *Animal Legal Defense Fund,* 104 F.3d at 428. The court in *Animal Legal Defense Fund* interpreted "quasi-public" as standing for a certain set of critical qualities, which included whether the establishing institution was purely private, who formed and funded it, and whether it was formed for the explicit purpose of furnishing advice to the Government. *Id.* at 429. The court then found that the National Academy of Sciences was just such a "quasi-public" institution and concluded that a committee formed by the NAS, which provided guidelines for handling and monitoring the treatment of laboratory animals relied on by the Department of Health and Human Services, was utilized by HHS and, therefore, a section 3 advisory committee. In contrast, several panels of the D.C. Circuit have concluded that a private contractor is not a "quasi-public" institution, and, therefore, groups established by such contractors are not utilized by federal agencies. *See Byrd,* 174 F.3d at 246; *Food Chem. News,* 900 F.2d at 331–32. In reaching this conclusion, then-Judge Ruth Bader Ginsburg, writing for the panel in *Food Chemical News,* explained that the legislative history made clear that the "Act does not apply to persons or organizations which have contractual relationships with Federal agencies." 900 F.2d at 331 (quoting from the House Conference Report). Presumably, this distinction was based on the fact that "government contractors, unlike the groups that prompted enactment of FACA, are subject to procurement reg-

ulations designed, or at least intended, to provide checks against waste and other misuses of government resources." *Id.* (internal citation omitted).

Relying primarily on *Food Chemical News* and *Byrd,* the Corps argues that it has not utilized the CBMC within the meaning of FACA section 3. The Corps argues that the CBMC does not meet the first prong of the utilize test, *i.e.* management and control, because the Corps is not formally represented on the committee and plays no part in setting its agenda or in scheduling or directing its meetings. Although Corps personnel have attended CBMC meetings, the Corps states that its personnel have been excluded from the meetings on occasion and, even when present, offer nothing more than information relevant to the CBMC's discussions. The Corps argues that the CBMC fails to satisfy the second prong of the utilize test, *i.e.* establishment by a quasi-public organization, because g.c.r., a private contractor, formed the CBMC.

In sharp contrast, Plaintiffs argue that the Corps *does* exercise actual management and control over the CBMC. First, Plaintiffs argue that the Partnering Agreement establishes a direct relationship between the Corps and the CBMC that was lacking in *Byrd* and *Food Chemical News,* through which the Corps can exercise influence and control. Second, Plaintiffs contend that, unlike in *Food Chemical News* and *Byrd,* where the advisory committee provided a report to the consulting firm, which in turn modified that report and presented it to the agency, here "g.c.r. acts merely as a scribe, writing up the results, conclusions and recommendations" of the CBMC without using or changing them. In other words, Plaintiffs argue that the CBMC's recommendations essentially pass unaltered to the Corps through g.c.r. Third, Plaintiffs argue that the Corps' retention of the ultimate approval authority over the CBMC's recommendations equates to actual control over the

CBMC. Fourth, Plaintiffs argue that the Corps' presence at the CBMC meetings illustrates the Corps' exertion of "influence over the deliberations of the CBMC." And fifth, Plaintiffs point to the letters from Col. Julich as establishing at least one instance of actual control of the committee.

Several of Plaintiffs' arguments can be dismissed as a matter of law. For example, *Washington Legal Foundation* clearly states that agency presence and even a certain degree of agency participation at a committee meeting does not equal control, and the evidence here overwhelmingly indicates that the Corps attended the CBMC meetings only to provide the CBMC with information relevant to their deliberations. Similarly, in most (if not all) of the FACA cases discussed above, the agencies were free to accept or reject the committee's recommendations. For example, in *Food Chemical News,* the expert panel was convened to identify "general and specific issues associated with the safety of food and cosmetics" for consideration by the Food and Drug Administration in promulgating future regulations. There is no indication that the FDA was bound to incorporate these issues into its regulative program—indeed, such an assumption would be unreasonable—yet, the D.C. Circuit held that the panel was not a section 3 advisory committee. Thus, it is of no moment that the Corps retains ultimate approval authority over the CBMC's recommendations.

This said, genuine issues of material fact surround the Partnering Agreement, the report to be submitted to the Corps, and the letters from Col. Julich. The evidence suggests that g.c.r. might alter the CBMC's recommendations significantly before it presents a final report to the Corps,[10] and the Court is not at all convinced that the Partnering Agreement amounts to much more than a public relations maneuver, but the remaining ambi-guities counsel against summary judgment. In sum, the Court finds that a genuine issue of material fact exists as to whether the Corps exercised actual management or control over the CBMC.

As to the second prong of the utilize test, the Court has already found that a genuine issue of material fact exists as to whether the Corps established the CBMC. Assuming *arguendo* that it did not, the Court would be hard pressed to find that the Corps utilized the CBMC under the second prong of the *Animal Legal Defense Fund/Byrd* utilize test, as there is no question that g.c.r. is a wholly private government contractor. "If indeed a necessary prerequisite for a group to be a 'utilized' advisory committee is that it must have 'quasi-public status' or must be created by an entity that has 'quasi-public status,' a 'semiprivate entity the Federal Government helped to bring into being,' or an 'organization created or permeated by the Federal Government,'" Steven P. Croley and William F. Funk, *The Federal Advisory Committee Act and Good Government,* 14 Yale J. on Reg. 451, 480 (1997) (referring to various formulations of the "quasi-public" prong of the utilize test), then the CBMC clearly was not "utilized" by the Corps.

4. If the Corps Did Not Establish the CBMC, Did It Violate a Congressional Mandate?

Taking a step outside the confines of FACA, Plaintiffs argue that, if the Corps did not establish the CBMC, then it violated its Congressional mandate to "designate an advisory group for the purposes of exchanging information and receiving community opinion and advising the District Engineer on various aspects of the project." Whether this directive amounted to a clear mandate to establish a section 3 advisory committee is hotly debated.

---

**10.** Indeed, in light of the seemingly substantial "technical assistance" g.c.r. provides to the CBMC, it might be a stretch to argue, as

Plaintiffs do, that g.c.r. acts "merely as a scribe" in communicating the CBMC's opinions to the Corps.

The Corps argues that the Court should focus on Section 326 of the Water Resources Development Act of 1996, which orders the Corps to "implement a comprehensive community impact mitigation plan," but does not expressly provide the manner in which the Corps should devise and implement that plan. Accordingly, the Corps argues that it was not required to establish a section 3 advisory committee and was within its discretion to hire a contractor to assist it in its endeavors. Plaintiffs concede that the 1996 Act does not expressly state that the Corps must establish a section 3 advisory committee, but argue that this is of no moment because, they argue, the 1991 Energy and Water Development Appropriations Act does. Therefore, they conclude, the Corps violated its Congressional mandate and/or illegally delegated its authority to a private entity to establish the advisory committee.

As a preliminary matter, the Court must correct one inaccuracy in the Plaintiffs' argument. The 1991 Appropriations Act, Pub.L. No. 101–514, 104 Stat. 2074, is silent as to the establishment of an advisory committee. Rather, it is the House and Senate Reports to this Act which discuss the advisory group requirement.[11] The reports do not constitute binding law; nonetheless, as the Court in *Public Citizen* noted, they are persuasive authority in interpreting a particular piece of legislation. *See* 491 U.S. 440 at 453 n. 9, 109 S.Ct. at 2566 n. 9, 105 L.Ed.2d 377 (noting that courts may consider committee reports as indications of congressional intent). Thus, it might be the case that Congress had the committee reports in mind when they drafted the 1996 Act, a conclusion supported by the 1996 Act's reference to "the evaluation report of the New Orleans District Engineer dated August 1995," which the Corps admits "was developed, in part based on specific Con-

gressional guidance received by the Corps in the reports of the Appropriations committees of both the [House] and Senate on the Fiscal Year 1991 Appropriations Act." In other words, Congress may not have instructed the Corps to designate an advisory committee in the 1996 Act expressly because it may not have believed it needed to do so.

Even if Congress wanted the Corps to "designate" an advisory committee, the Court is not convinced that the Corps violated that mandate by hiring a private contractor to do the technical work. The Court's concern revolves around the word "designate." Plaintiffs essentially argue that Congress ordered the Corps to "establish" a section 3 advisory committee, which, as discussed above, would require the Corps to *directly* establish the advisory committee. Thus, they conclude, the Corps either (1) violated the law by *indirectly* establishing an advisory committee or (2) illegally delegated its authority to *directly* establish an advisory committee to a private entity. However, the Court finds it significant that the House and Senate Reports instruct the Corps to "designate," *not* to "establish," an advisory group. Although this may seem like a distinction without a difference, the Court presumes that Congress is aware of the technical usage of statutory terms, especially when subsequent legislation potentially implicates a particular, pre-existing statute. In other words, when the Appropriations Committees ordered the Corps to "designate" a group that certainly sounds like a section 3 advisory committee, the Court can assume that the Committees used the word "designate" to remove this group from the section 3 definition.[12] Thus, the Court finds it reasonable to assume that Congress intended to give the Corps discretion in deciding whether to create a formal FACA committee or to avoid the

---

**11.** In fairness, it is the Holy Cross Plaintiffs who have made this error. The ACORN Plaintiffs expressly acknowledge that we are dealing with the report, not the Act itself.

**12.** The reports in question were submitted approximately one year after the Supreme Court interpreted the terms "establish" and "utilize" in *Public Citizen*.

requirements of FACA (which is not as devious as it sounds, *see Food Chem. News*, 900 F.2d at 331) if the additional monetary and temporal costs of complying with FACA would be unreasonable.

In any event, even if Congress did intend for the Corps to directly establish a section 3 advisory committee,[13] the Court need not decide at this point whether the Corps violated this mandate. As noted above, the Court finds a genuine issue of material fact as to whether the Corps established the CBMC. If the Corps did establish the CBMC, then Plaintiffs' argument is mooted.

### 5. Is a Preliminary Injunction Warranted?

Under Federal Rule of Civil Procedure 65, a preliminary injunction is available only where the mover shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *See America's Favorite Chicken Co. v. Kim*, 1993 WL 441854 (E.D.La. Oct. 25, 1993) (Clement, J.). Here, the motion for summary judgment and the first factor of the preliminary injunction test overlap, and, as described above, the Court has found some likelihood that Plaintiffs will succeed on the merits. Nonetheless, the Court finds that Plaintiffs have failed to demonstrate a substantial

threat of irreparable injury which would outweigh the potential damage to the CBMC's work and the public interest were an injunction to issue.

Plaintiffs allege that they will suffer two forms of irreparable harm if a preliminary injunction is not granted. First, Plaintiffs contend that their FACA right to open meetings will be permanently lost unless the Court enjoins the CBMC's practice of conducting closed meetings. *See* FACA § 10(a)(1). Second, Plaintiffs contend that their FACA right to "attend, appear before, or file statements" with the CBMC will be permanently lost unless the Court enjoins the closed meetings. *See* FACA § 10(a)(3). Plaintiffs further contend that these threatened harms outweigh the potential harm to the Corps and to the public were an injunction to issue.

The Court finds that Plaintiffs have failed to demonstrate a substantial and irreparable harm. As the Supreme Court held in *Public Citizen*, FACA is best applied in light of its underlying purposes. As noted above, one of the goals of FACA is to reduce the influence exerted by special interests on agency decision makers through advisory committees by ensuring the openness and accountability of such committees. The facts presented to the Court indicate that, despite its closed meetings, the CBMC has been operating in the open. Its minutes are transcribed almost verbatim and posted on a website within approximately a week. This website also indicates when the next meeting of the CBMC will be. Thus, although the

---

13. If Congress did intend for the Corps to establish a section 3 advisory committee, this does not necessarily mean that it was unlawful for the Corps to employ the technical expertise of a private entity to carry out that directive. Supposing that the Corps could enlist a government contractor to establish an advisory committee on its behalf leads to an interesting question: under these circumstances, could the resulting advisory committee be considered "utilized" by the Corps within section 3? Clearly, an affirmative answer would add a third prong to the utilize test where now there exist only two, but such a result is not without its theoretical justifica-

tions. For example, Professors Croley and Funk note that if the "quasi-public" test is "viewed as just one factor in deciding whether a private group is 'utilized' within the meaning of the FACA, then the term may serve the purpose of preventing agencies from evading the FACA merely by having a private entity create a group which otherwise would be controlled by the agency." 14 Yale J. on Reg. at 480. Plaintiffs argue in favor of such an interpretation. Were the Court to accept this argument, it would find that the Corps' actions were within the limits of its discretion, but the CBMC is utilized by the Corps.

CBMC has not necessarily complied with the letter of the law, it has complied with the spirit, and the harm is neither substantial nor irreparable. *See, e.g.,* FACA § 10(a)(2) (requiring public notice of each meeting), (b) (requiring public availability of transcripts prepared by committee) and (c) (requiring keeping of detailed minutes of committee meetings). The Court also finds that Plaintiffs failed to demonstrate that they will not be able to "attend, appear before, or file statements with" the CBMC. The Court first notes Congress' use of the disjunctive: the Plaintiffs do not have the right to attend, appear before *and* file statements with the CBMC. Given the intense opposition to the modernization project and the apparent likelihood that at least some members of the public will attempt to disrupt CBMC meetings in protest, the Court finds the CBMC's decision to hold closed working meetings reasonable and (assuming the CBMC is not a section 3 advisory committee) in the public interest.[14] Moreover, Plaintiffs admitted to the Court during a status conference that they had not even attempted to file any statements with the CBMC. Although the harm does not actually have to occur in order for a court to issue a preliminary injunction, the Court doubts whether the CBMC would refuse to accept the statements of the public it is charged with representing. Indeed, each member of the CBMC appears to have been selected because he or she has a connection with a particular demographic and will therefore communicate the desires of his or her constituency to the rest of the group. Why a group of such individuals would refuse even to consider the statements of their neighbors is not readily apparent. Thus, when all the factors are considered, the Court finds that Plaintiffs have failed to demonstrate the need for a preliminary injunction.

## C. *CONCLUSION*

The case at bar poses several challenging and novel legal issues with respect to the Federal Advisory Committee Act. On the evidence before the Court, these issues are not ripe for decision, and no harm likely will come by waiting. Accordingly,

IT IS ORDERED that Defendants' Motion for Summary Judgment and Plaintiffs' Motion for Preliminary Injunction are DENIED.

---

14. The CBMC might want to consider steps to "open" their meetings without risking disruption, such as broadcasting their meetings over closed circuit television in the next room.